1999 SD 122

**James BRUGUIER, Petitioner and Appellant,**

v.

**Joseph CLASS, Warden, South Dakota State Penitentiary, Appellee.**

**No. 20216.**

Supreme Court of South Dakota.

Argued Jan. 13, 1999.

Decided Sept. 1, 1999.

Rehearing Denied Oct. 7, 1999.

 

John M. Wilka of Wilka, Haugen & Kirby, P.C., Sioux Falls, for petitioner and appellant.

Mark Barnett, Attorney General, John P. Guhin, Deputy Attorney General, Pierre, for appellee.

KONENKAMP, Justice.

[¶ 1.] In this appeal, we must again decide the status of certain lands lying within the 1858 boundaries of the Yankton Sioux Reservation. By habeas corpus petition, James Bruguier challenges state jurisdiction in Pickstown, the place of his criminal offense. The United States Supreme Court in *South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329, 118 S.Ct. 789, 139 L.Ed.2d 773 (1998) [*Yankton Sioux Tribe*], held that *unallotted* lands ceded to the United States were subject to state jurisdiction. Here we must decide the status of *allotted* lands, which have passed into non-Indian ownership. We conclude that this territory is not Indian country as defined by federal law, and therefore South Dakota properly maintains jurisdiction. We affirm the decision denying Bruguier's habeas petition.

A

[¶ 2.] A jury found James Bruguier guilty of first degree burglary on August 21, 1992. He later pleaded guilty to being a habitual offender. On appeal, we affirmed. *State v. Bruguier*, 510 N.W.2d 126 (S.D.1993). He committed the burglary in Pickstown, South Dakota, which lies within the original 1858 boundaries of the Yankton Sioux Indian Reservation. His first petition for writ of habeas corpus was denied, but based on the U.S. District Court's decision in *Yankton Sioux Tribe v. Southern Missouri Waste Management District*, 890 F.Supp. 878 (D.S.D.1995), concluding that the 1858 Reservation remained intact, Bruguier filed a second petition. The circuit court also denied that petition, based on our decision in *State v. Greger*, 1997 SD 14, 559 N.W.2d 854. While his appeal to this Court was pending, the United States Supreme Court de-

cided *Yankton Sioux Tribe,* 522 U.S. at 329, 118 S.Ct. at 789. We then remanded his case for a decision on whether the burglary occurred on land retaining reservation or Indian country status under 18 USC § 1151.

[¶ 3.] The parties stipulated that the offense occurred on allotted land to which Indian title had been extinguished, but left to the habeas judge to decide whether the land remained Indian country under federal law. The court found that the place where the offense was committed lies on formerly allotted land, "the Indian title to which has been long extinguished [and] is now held in fee title by non-Indians."[1] Also, the court concluded the reservation had been disestablished and that no lands within the former 1858 boundaries now constitute a reservation under 18 USC § 1151; therefore, the offense did not occur in Indian country and state jurisdiction was proper. Bruguier's petition for writ of habeas corpus was denied. On the same day the circuit court signed its findings, the U.S. District Court ruled that the 1858 boundaries remain intact, thus by inference making Pickstown Indian country. *Yankton Sioux Tribe v. Gaffey,* 14 F.Supp.2d 1135 (D.S.D.1998) [*Gaffey* ]. Bruguier now appeals.[2] Jurisdiction may be properly challenged through a habeas petition. *Flute v. Class,* 1997 SD 10, ¶ 8, 559 N.W.2d 554, 556 (citing *Weiker v. Solem,* 515 N.W.2d 827, 830 (S.D.1994)).

**B**

[¶ 4.] The legal history of the Yankton Sioux Reservation is described in *Yankton Sioux Tribe,* 522 U.S. at 329, 118 S.Ct. at 789, and *Greger,* 1997 SD 14, 559 N.W.2d at 854. We address only those particulars bearing on the present question. The Yankton Sioux Indian Reservation was created by the 1858 Yankton Treaty of Cession. *Greger,* 1997 SD 14, ¶ 3, 559 N.W.2d at 857. With the passage of the General Allotment (Dawes) Act in 1887, the Yankton Reservation was to be partitioned with parcels to be assigned to individual tribal members.[3] In 1892, the Tribe and the United States negotiated a second treaty, which Congress ratified in 1894. *Id.* ¶¶ 1, 4. By this agreement, for a "sum certain," the Tribe "ceded, sold, relinquished and conveyed" all its unallotted reservation lands to the United States. *Id.* ¶ 1.

[¶ 5.] After President Cleveland's proclamation opened the unallotted lands for settlement in 1895, the area filled with settlers. The history is recounted in the writings of author and journalist, Adeline S. Gnirk.[4] In her retelling, the Chicago, Milwaukee & St. Paul Railroad secured a right-of-way in 1897 to extend its line through the opened reservation from Napa to the place where the town of Platte was later founded. The railbed was completed in 1900. Within a year four townsites originated along the railway: Wagner, Lake Andes, Geddes and Platte. Dante and Ravinia were soon added as railroad stops. The region was transformed. Typical perhaps is the rise of Lake Andes, which was platted in 1901 and formally established as a town in 1904.

---

**1.** See the shaded Pickstown map in the *Gaffey* Joint Appendix, Volume V, at 1379, Briefs from *Yankton Sioux Tribe, et al. v. Gaffey, et al.* (8thCir.1999).

**2.** In this instance, our review of the circuit court's decision is de novo as we are deciding "whether the established facts fall within the relevant legal definition." *Falls v. Nesbitt,* 966 F.2d 375, 377 (8thCir.1992).

**3.** Professor Herbert Hoover points out that certain lots were earlier assigned or distributed to Yankton "families." In 1869, 177 80-acre lots were surveyed and in 1874, additional 40-acre lots were surveyed. The General Allotment Act invalidated all the "family" assignments and provided for "individual" allotments. Herbert Hoover, A Yankton Sioux Tribal Land History 5 (1995).

**4.** A. Gnirk, The Epic of the Realm of Ree (1984); A. Gnirk, The Epic of the Great Exodus (1985); A. Gnirk, The Epic of Papineau's Domain (1986).

When inherited Indian lands commenced to be sold, a location was secured on Section 4, the present site. This land including the 80 acres then platted and the 120 acres adjoining had been allotted to John Arthur, or Sparrow Hawk. He died and in 1904 his only heirs, his wife Taniyawakanwin, and daughter Bessie Zitka Koyewin were induced to sell 80 acres of this land to the Lake Andes Townsite Company.

Gnirk, Papineau's Domain, *supra* note 4, at 143, *cited in Gaffey* Joint Appendix, at 765. Even during the twenty-five year trust period required by the Dawes Act, Article XI of the 1894 Act allowed for the sale of allotted lands on the death of certain allottees. By 1916, Lake Andes won a decade-long battle with the other railroad towns to become the county seat, replacing Wheeler. Construction on the new courthouse began in 1917. The town remains the county seat to this day. Its courthouse and law enforcement center both sit on formerly allotted land.

[¶ 6.] For the Yanktons, too, life changed dramatically.

Immediately after initial allotment proceedings ended in 1894, agency officials divided the reservation into two farm jurisdictions to hasten the adjustment of adults.... [They were taught] techniques of using horse-drawn machinery, selective livestock breeding, dry farming on arid land, and maintaining agricultural equipment.

Herbert T. Hoover & Leonard R. Bruguier, The Yankton Sioux 46 (1988). Tribal government quickly faded and became nonexistent. Indeed, the agency Superintendent in 1903 "declared that tribal government by chiefs was a thing of the past." *Id.* at 53. Even the tribal business committee disappeared, until revived years later. *Id.* The Court of Indian Offenses, which dealt with crimes by Indians against Indians on allotted land, was abolished in 1909. As the habeas court found, "[o]f the approximately 260,000 acres originally al-lotted to Indians, by 1913, just twenty-one years later, the tribal members held only 70,000 acres.... They had thus divested themselves of over 190,000 acres. By 1930, tribal members owned only 43,358 acres." The federally supported agency boarding school closed in 1919 and its students transferred to county public schools. Yanktons were added to the county jury list and several were elected or appointed to county and local offices, including clerk of courts, constable, election judge and clerk.

[¶ 7.] The present character of the area reflects the turn of the century changes that followed the reservation opening. From the 262,000 acres originally allotted, only about fifteen percent remain in Indian hands. "Today, the total Indian holdings in the region consist of approximately 30,-000 acres of allotted land and 6,000 acres of tribal land." *Yankton Sioux Tribe*, 522 U.S. at 339, 118 S.Ct. at 796 (citing Indian Reservations: A State and Federal Handbook 260 (1986)).

C

[¶ 8.] Bruguier committed burglary at a home in the state-chartered municipality of Pickstown. Although a substantial portion of the site on which Pickstown rests is former allotment land, none of it is now held by the Tribe or in trust. Pickstown has its own unique origin. Named for General Lewis A. Pick of the Corps of Engineers, the town was established in 1946. The U.S. Army Corps of Engineers created it as part of the Fort Randall Dam project to accommodate workers and their families. *See generally* Flood Control Act of 1944, Pub. L. No. 78–534, 58 Stat. 887 (1944)(codified as amended at 16 USC § 460d (1976)).[5] To permit building hydroelectric and flood control dams on the Missouri River, supporting enactments authorized the taking of portions of certain Indian reservations, including the nearby

---

5. Also known as the Pick–Sloan Missouri River Basin program.

Crow Creek Sioux and Lower Brule Reservations.[6] In those enactments the text mentions taking "reservation" land. In contrast, the body of the eminent domain statute dealing with the Yankton Sioux refers to taking only "tribal and allotted lands," but the title in the original enactment (Pub. L. No. 83–478) does refer to the Yankton Sioux Reservation.[7] *See* 43 USC § 1200e (68 Stat. 453 (1954))(authorizing expenditure to relocate tribal members "who reside or have resided, on tribal and allotted lands acquired by the United States for the Fort Randall Dam and Reservoir project"). This latter law also provided that "title to any lands acquired within Indian country pursuant to this section shall be taken in the name of the United States in trust for the Yankton Sioux Tribe or members thereof."

[¶ 9.] In 1957, by authority of the Federal Property and Administrative Services Act of 1949, Pub. L. No. 63–152, 63 Stat. 378, allowing disposal of surplus federal property to stimulate industrial development, Pickstown was designated by Congress as an area eligible, upon Indian request, for transfer without cost to an Indian tribe or other Indian entity. *See* 25 USC 463(d) (1997). Apparently, no transfer took place. In 1985, Congress relinquished this land to the municipal corporation serving the people of Pickstown.

### TRANSFER OF FEDERAL TOWNSITES

(a)(1) Except as otherwise provided in this Act and notwithstanding any other provision of law, the Secretary of the Army shall transfer, without consideration and without warranty of any kind, all rights, title, and interests of the United States in each of the following described lands (including all improvements on such lands) to the municipal corporation serving the inhabitants of such land as soon as possible after the incorporation of such municipal corporation:

\* \* \*

(B) The land referred to as Pickstown, South Dakota, consisting of 393 acres, more or less. . . . .

Supplemental Appropriations Act of 1985, Pub. L. No. 99–88, ch. VI, 99 Stat. 293, 317. This law was later amended "by striking out 'without warranty of any kind' and inserting in lieu thereof 'by warranty deed, said deed to include a covenant to defend title to the property.'" Water Resources Development Act of 1986, Pub. L. No. 99–662, 100 Stat. 4082, 4242.[8]

[¶ 10.] We appreciate, of course, that a federally authorized townsite may still be Indian country if it exists within the boundaries of an Indian reservation, even after title has been transferred in fee to non-Indians. *Seymour v. Superinten-*

---

6. *See* Act of October 3, 1962, Payment for Lands of Crow Creek Sioux Reservation, Pub. L. No. 87–735, 76 Stat. 704; Act of October 3, 1962, Payment for Lands of Lower Brule Sioux Reservation, Pub. L. No. 87–734, 76 Stat. 698; Act of September 2, 1958, Payment for Lands to Lower Brule Sioux Tribe, Pub. L. No. 85–923, 72 Stat. 1773; Act of September 2, 1958, Payment for Lands to Crow Creek Sioux Indians, Pub. L. No. 85–916, 72 Stat. 1766; Act of September 2, 1958, Oahe Dam and Reservoir Project, Pub. L. No. 85–915, 72 Stat. 1762 (Standing Rock Sioux Tribe); Act of September 3, 1954, Pub. L. No. 83–776, 68 Stat. 1191 (Oahe Dam—Cheyenne River Tribe); Act of October 29, 1949, Pub. L. No. 81–437, 63 Stat. 1026 (Garrison Dam—Fort Berthold Tribe).

7. The title to this Act refers to the "Yankton Sioux Indian Reservation." Yet within the body of this enactment only Lower Brule and Crow Creek are referred to as reservations. Whereas, the body of this law refers to Yankton "tribal and allotted lands."

8. The amendment also conveyed an additional twenty-three acres of land used by Pickstown as a sanitary landfill. The Corps of Engineers retained a 9-acre tract where maintenance buildings and an office building are located. The office building houses the town's Post Office and Credit Union under lease. Also retained was a cold storage warehouse and immediate land located on a 16-acre tract.

dent of Washington State Penitentiary, 368 U.S. 351, 358–59, 82 S.Ct. 424, 428–29, 7 L.Ed.2d 346 (1962). In addition, reservation land taken by eminent domain will not necessarily extinguish reservation boundaries. *Lower Brule Sioux Tribe v. State of South Dakota,* 711 F.2d 809 (8th Cir.1983). Yet, when read together, these enactments appear incompatible with any conception of this region as part of an existing Indian reservation. No reference is made to taking "reservation" land from the Yankton Sioux in the various flood control takings statutes. And Congress must not have considered Pickstown Indian country taken in trust for the Yankton Tribe or its members, for it was not returned to them, but to the municipal corporation.

[¶ 11.] Nonetheless, the Federal Government has been inconsistent in its references to the Yankton Reservation over the past century. We think it prudent, therefore, to analyze the question further under traditional Indian law standards established by the Supreme Court. *See Yankton Sioux Tribe,* 522 U.S. at 354, 118 S.Ct. at 803 ("Congress and the Executive Branch have described the reservation in contradictory terms and treated the region in an inconsistent manner.").

### D

■■ [¶ 12.] "Interpretation of federal law is the proprietary concern of state, as well as federal, courts." *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 275, 117 S.Ct. 2028, 2037, 138 L.Ed.2d 438 (1997). Indeed, the jurisdictional issue here is as vital to South Dakota as it is to the Yankton Sioux Tribe and the Federal Government; thus, it is proper for this Court to determine where state jurisdiction lies.[9] Whether land falls within a reservation or constitutes Indian country "depends upon the interpretation and ap-

plication of federal law." *Seymour,* 368 U.S. at 353, 82 S.Ct. at 426.

[O]nly Congress can divest a reservation of its land and diminish its boundaries. Once a block of land is set aside for an Indian reservation and no matter what happens to the title of individual plots within the area, the entire block retains its reservation status until Congress explicitly indicates otherwise.

*Solem v. Bartlett,* 465 U.S. 463, 470, 104 S.Ct. 1161, 1166, 79 L.Ed.2d 443 (1984)(citing *United States v. Celestine,* 215 U.S. 278, 285, 30 S.Ct. 93, 94–95, 54 L.Ed. 195 (1909)); *see also Yankton Sioux Tribe,* 522 U.S. at 343, 118 S.Ct. at 798 ("[O]nly Congress can alter the terms of an Indian treaty by diminishing a reservation."); *DeCoteau v. District County Court for the Tenth Judicial Dist.,* 420 U.S. 425, 444, 95 S.Ct. 1082, 1092–93, 43 L.Ed.2d 300 (1975)(after a reservation has been created "all tracts included within it remain a part of the reservation until separated therefrom by Congress"); Monroe Price & Robert Clinton, Law and the American Indian 96 (2d ed. 1973)("Once a reservation has been established, or a dependent Indian community shown to exist, it will remain Indian country until terminated by Congress, irrespective of the nature of the land ownership.").

■■ [¶ 13.] Congressional intent to terminate a reservation is not "lightly found" and ambiguities are to be resolved against it. *Hagen v. Utah,* 510 U.S. 399, 411, 114 S.Ct. 958, 965, 127 L.Ed.2d 252 (1994) (citations omitted); *see also DeCoteau,* 420 U.S. at 444, 95 S.Ct. at 1092–93. Intent to remove land from reservation status must be clearly manifested. *DeCoteau,* 420 U.S. at 444, 95 S.Ct. at 1093. Without unambiguous intent, the general rule that "doubtful expressions" are construed in a light most favorable to the

9. For this reason, we have received and reviewed all the briefs and exhibits submitted to the Eighth Circuit Court of Appeals in *Yankton Sioux Tribe v. Gaffey.* The status of ap-

proximately 222,000 acres of formerly "allotted" land now owned by non-Indians in southern Charles Mix County is open to uncertainty.

Indians, applies to our review of statutory and treaty language. *Id.*

### E

▮ [¶ 14.] The Federal Government generally has jurisdiction over Indian country, along with the Indian Tribe inhabiting it. *Alaska v. Native Village of Venetie Tribal Gov't,* 522 U.S. 520, 527 n. 1, 118 S.Ct. 948, 952 n. 1, 140 L.Ed.2d 30 (1998) [*Venetie* ]. Bruguier contends that whatever their present ownership, all originally allotted lands maintain Indian country status under 18 USC § 1151(a), as they lie within the 1858 boundaries of the Yankton Sioux Indian Reservation.[10] He believes that nothing in the negotiations, the treaty, or the later development in the territory suggests that sales of *allotted* land to non-Indians would diminish the reservation beyond what the sale of the *unallotted* land accomplished. On the other hand, the State argues, based on *Greger,* that the reservation was disestablished by the 1894 Act, leaving as Indian country only Indian retained allotments and tribally owned land.[11]

10. This was essentially the U.S. District Court's decision in *Gaffey,* 14 F.Supp.2d at 1135.

11. As we were only dealing with the question whether the sale of all unallotted lands shrunk the boundaries of the reservation, *Greger* found the reservation had been *diminished,* rather than *disestablished.*

12. 18 USC § 1151 provides:
Except as otherwise provided in sections 1154 and 1156 of this title, the term "Indian country", as used in this chapter, means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

13. 18 USC § 1151 was enacted in 1948. The Reviser's Note to the statute indicates that the

[¶ 15.] Our task is to decide whether Pickstown is Indian country. More precisely, the question is whether parcels originally allotted to individual Yanktons compose part of a permanent reservation under 18 USC § 1151(a), or whether only those allotments still held in Indian hands are Indian country under 18 USC § 1151(c).[12] Three categories of land qualify as Indian country under 18 USC § 1151. First, § 1151(a) includes as Indian country those lands within the boundaries of a reservation under United States Government jurisdiction. Second, § 1151(b) defines Indian country as "all dependent Indian communities" within the United States. We need not address this subsection as no one in this appeal contends the Pickstown site or any other place on similarly non-retained allotment land is a "dependent Indian community." Third, § 1151(c) includes as Indian country all Indian allotments that have not lost their Indian titles.[13]

[¶ 16.] In *State ex rel. Hollow Horn Bear,* 77 S.D. 527, 95 N.W.2d 181 (1959),

definition of Indian country was derived from "the latest construction of the term by the United States Supreme Court." 18 USC § 1151 reviser's note. Congress used language from *United States v. McGowan,* 302 U.S. 535, 58 S.Ct. 286, 82 L.Ed. 410 (1938), *United States v. Pelican,* 232 U.S. 442, 34 S.Ct. 396, 58 L.Ed. 676 (1914), *United States v. Sandoval,* 231 U.S. 28, 34 S.Ct. 1, 58 L.Ed. 107 (1913), and *Donnelly v. United States,* 228 U.S. 243, 33 S.Ct. 449, 57 L.Ed. 820 (1913). In *Pelican,* the Court decided whether an Indian allotment that was once part of the Colville Indian Reservation but was situated in a part of the reservation that had been opened to settlement by Congress was Indian country. 232 U.S. at 444–45, 34 S.Ct. at 397. The Colville Indian Reservation was included in the definition of Indian country, as it had "been segregated from the public domain." *Id.* at 445, 34 S.Ct. at 397. The Court concluded that because the land was an allotment held in trust for an individual Indian, the federal government still retained criminal jurisdiction over this land, even though the land lay in the diminished part of the reservation. *Id.* at 447, 34 S.Ct. at 398.

we interpreted 18 USC § 1151 to mean that subsection (a) encompasses those areas within a reservation, and that subsection (c) applies to those lands standing outside reservation boundaries.

> If subsection (a) is to receive a literal interpretation a patent to allotted lands within the limits of such a reservation which operated to extinguish the Indian title would not remove such a tract from Indian country, but under subsection (c) such a patent would so operate. Hence, it seems logical to believe that the Congress intended subsection (a) to apply to the closed area of reservations, and (c) to apply to allotted lands in open territory.

*Hollow Horn Bear*, 95 N.W.2d at 185. If the only Indian country remaining is land the Yankton Tribe acquired long after the 1894 Act, along with remaining Indian owned allotments under § 1151(c), then the Yankton Sioux Reservation may be considered congressionally terminated.

F

[¶ 17.] In *Yankton Sioux Tribe*, the Supreme Court ruled that "Congress diminished the Yankton Sioux Reservation in the 1894 Act, that the unallotted tracts no longer constitute Indian country, and thus ... the State has primary jurisdiction over ... lands ceded under the Act." 522 U.S. at 358, 118 S.Ct. at 805. The Court limited its holding to deciding only that the "unallotted, ceded lands were *severed* from the reservation[.]" *Id.* (emphasis added). Left undecided was whether there now exists any reservation boundary, and if so, where it lies. We conclude, the boundaries created in the 1858 Treaty no longer exist because no provision was made in the 1894 Act to delineate any boundary, as in the 1858 Treaty. In most instances, when a reservation is diminished, its boundaries "shrink." *Solem*, 465 U.S. at 471, 104 S.Ct. at 1166. Indeed, the Supreme Court in *Yankton Sioux Tribe* found that the 1894 Act is "readily distinguishable from surplus land Acts that the Court has inter-

preted as maintaining reservation boundaries." 522 U.S. at 345, 118 S.Ct. at 799.

[¶ 18.] Even with the 1858 boundaries extinct, however, we still must return to the Supreme Court's traditional three-factor "analytical structure" to decide the status of the lands left unresolved in *Yankton Sioux Tribe*. *Hagen*, 510 U.S. at 411, 114 S.Ct. at 965.

> The most probative evidence of diminishment is, of course, the statutory language used to open the Indian lands. We have also considered the historical context surrounding the passage of the surplus land Acts, although we have been careful to distinguish between evidence of the contemporaneous understanding of the particular Act and matters occurring subsequent to the Act's passage. Finally, "[o]n a more pragmatic level, we have recognized that who actually moved onto opened reservation lands is also relevant to deciding whether a surplus land Act diminished a reservation."

*Id.* (internal citations omitted)(quoting *Solem*, 465 U.S. at 471, 104 S.Ct. at 1166–67). *Yankton Sioux Tribe* and *Greger* scrutinized these three factors. We need not repeat all their conclusions here. Instead, we will touch on those points deemed more ambiguous.

**1. Statutory Language**

[¶ 19.] Articles I and II of the 1894 Act provided that the Yankton Tribe did "cede, sell, relinquish, and convey to the United States all their claim, right, title, and interest in and to all the unallotted lands within the limits of the reservation" and that in consideration for the "lands ceded, sold, relinquished, and conveyed" the United States agreed to pay a sum certain of $600,000. *Yankton Sioux Tribe*, 522 U.S. at 344, 118 S.Ct. at 798; *Greger*, 1997 SD 14, ¶ 4, 559 N.W.2d at 858. Equivalent language signaled termination of the reservation in *DeCoteau*, where the Supreme Court noted that such terminology was "precisely suited" to such purpose. 420

U.S. at 445, 95 S.Ct. at 1093. Being the most probative evidence, this cession language manifests an almost irrebuttable presumption of congressional intent. *Greger*, 1997 SD 14, ¶ 1, 559 N.W.2d at 855–56. Yet, other clauses in the Act are less absolute. Are these so uncertain as to negate the nearly conclusive import of the cession language? To appreciate the idiom of the 1894 Act, it is first important to understand the genesis of the allotment system and the legal notion of Indian ownership of reservations at that time.

[¶ 20.] Many well-meaning reformers, legislators, and federal officials viewed reservations as interim solutions to eventual Native American assimilation. When compressed, they theorized, Indian "detribalization" and "Americanization" would take place.[14] Reservations, therefore, were expected to have a limited life span. Arrell Morgan Gibson, The American Indian, Prehistory to the Present, 452, 486, 489, 491 (DCHeath & Co 1980). The Dawes Act had the dual goal of hastening the "detribalizing" process and opening reservation land to "homeseekers." *Id.* at 494–95, 498, 506. *See also Solem*, 465 U.S. at 468, 104 S.Ct. at 1165 (surplus land acts anticipated imminent demise of reservations and were enacted partly to facilitate the process). It would end common ownership by tribes, as well as the tribal way of life.

> Under the practice of allotting lands in severalty to individual Indians, title to the allotted land was held in trust by the Government for the benefit of the allottee, or vested in the allottee subject to a restraint against alienation. Obviously, in either case tribal title is not involved.

Felix Cohen, Handbook of Federal Indian Law 7–8 (1st ed. reprint 1986). The allotment system later proved a dreadful failure, but at the time it was assumed that, for the benefit of assimilation and civilization, Indian and non-Indian families would intersperse over the opened reservations, making tribal existence and governance obsolete. *Solem*, 465 U.S. at 468, 104 S.Ct. at 1165. These philosophic assumptions emerge in the negotiations between Government representatives and Yankton Tribe members, where both sides spoke of tribal life as soon to be outdated. *Yankton Sioux Tribe*, 522 U.S. at 353, 118 S.Ct. at 803 (citing Report of the Yankton Indian Commission (Mar. 31, 1893), at 19, *reprinted in* S. Exec. Doc. No. 27, 53d Cong., 2d Sess., 9–11 (1894); S Misc. Doc. No. 134, 53d Cong., 2d Sess., 1 (1894)).

[¶ 21.] The Government's notion of Indian ownership and how it legally ended can be seen in congressional enactments and early Supreme Court decisions. In 1834, Congress statutorily defined Indian country. It upheld the communal objective of tribal communities with the understanding that once title to Indian land was extinguished, the land was no longer in Indian ownership.

> That all that part of the United States west of the Mississippi, and not within the states of Missouri and Louisiana, or the territory of Arkansas, and, also, that part of the United States east of the Mississippi river, and not within any state to which the Indian title has not been extinguished, for the purposes of this act, be taken and deemed to be Indian country.

14. As one historian expressed:

> For more than one-half century, sincere friends of the Indians had been advocating the individual ownership of land as the salvation of any Indian who would accept it. Like other mistaken policies it was all part of the centuries-old aim of changing Indians into white people. Break up their natural grouping, whether by abolishing the government of advanced tribes or undermining the influence of primitive chiefs, and set each family alone on a farm to develop habits of industry and the pride of possession.... The Indians' friends also argued that only a fee simple title would protect their land from the insecurity of reservation and treaty guarantees.
> Angie Debo, A History of the Indians of the United States 299 (UOkPress 1970).

Act of June 30, 1834, Pub. L. No. 23–161, 4 Stat. 729. When the U.S.Code was revised, however, this section was not included, effectively repealing it. Cohen, *supra*, at 6. The definition, nevertheless, shows that even in early usage of the term Indian country, Congress intended it to include only those lands to which Indian title had not been extinguished.

[¶ 22.] After repeal of 1834 definition of Indian country, the Supreme Court in *Bates v. Clark*, 95 U.S.(5 Otto) 204, 24 L.Ed. 471 (1877), defined the term:

> The simple criterion is that as to all the lands thus described it was Indian country whenever the Indian title had not been extinguished, and it continued to be Indian country so long as the Indians had title to it, and no longer. As soon as they parted with the title, it ceased to be Indian country, without any further act of Congress, unless by the treaty by which the Indians parted with their title, or by some act of Congress, a different rule was made applicable to the case.

*Id.* at 208; *see* Cohen, *supra*, at 7 (explaining the origin of the definition of Indian country). *See generally Perrin v. United States*, 232 U.S. 478, 34 S.Ct. 387, 58 L.Ed. 691 (1914). In *Greger*, we observed that "*Perrin*'s notion of Indian country was consistent with the view at the time that reservations included 'only those lands in which the Indians held some form of property interest: trust lands, individual allotments, and, to a more limited degree, opened lands that had not yet been claimed by non-Indians.'" 1997 SD 14, ¶ 8, 559 N.W.2d at 860 (quoting *Solem*, 465 U.S. at 468, 104 S.Ct. at 1165). In sum, Indian title in common, or put another way, tribal title, ended when tribal ownership ended. *Yankton Sioux Tribe*, 522 U.S. at 346, 118 S.Ct. at 798, (citing *Solem*, 465 U.S. at 468, 104 S.Ct. at 1164) (tribal ownership coextensive Indian ownership).

---

**15.** It was decades after the reservation was opened that the Tribe acquired land from the Government that the United States no longer needed. Act of February 13, 1929, Pub. L.

■ [¶ 23.] Noteworthy in the 1894 Act is the absence of any provision for tribal ownership. No land was reserved even for tribal purposes.[15] By eliminating tribal ownership, the "common understanding of the time" was that a "critical component of reservation status" was lost. *Yankton Sioux Tribe*, 522 U.S. at 346, 118 S.Ct. at 799. Individual Indians received their allotments and, except for agency and school land, all the rest was sold and opened for homesteads and townsites. It was not until the following century that Indian ownership and tribal ownership were legally distinguished in identifying Indian country. By then, of course, more tolerant and enlightened notions of preserving aboriginal self-determination and culture gained ascendancy. Congressional enactments suitably followed. Congress has "plenary power over Indian affairs, including the power to modify or eliminate tribal rights." *Id.* at 343, 118 S.Ct. at 798 (citations omitted); *see also Sandoval*, 231 U.S. at 46, 34 S.Ct. at 5–6 ("Congress ... has a right to determine for itself when the guardianship which has been maintained over the Indian shall cease."). With this background in mind, we examine a few of the purportedly discrepant provisions in the 1894 Act.

[¶ 24.] The Supreme Court in *Yankton Sioux Tribe* expressed some misgivings on the import of certain language in Article VIII.

> Although we agree with the State that the school sections clause reinforces the view that Congress intended to extinguish the reservation status of the unallotted land, a somewhat contradictory provision counsels against finding the reservation terminated. Article [VIII] of the 1894 Act reserved from sale those surplus lands "as may now be occupied by the United States for agency, schools, and other purposes." In *Solem*, the Court noted with respect to virtually

---

No. 70–729, 45 Stat. 1167 (returning to Tribe 1000 acres titled in United States that had been reserved in the 1894 Act for "agency, school, and other purposes").

identical language that "[i]t is difficult to imagine why Congress would have reserved lands for such purposes if it did not anticipate that the opened area would remain part of the reservation." 465 U.S. at 474, 104 S.Ct. at 1168. *Yankton Sioux Tribe*, 522 U.S. at 350, 118 S.Ct. at 801. Reserving to the United States lands for agency, school and other purposes suggests continued Government support for tribal members, and possibly evinces the notion of a continuing reservation. Yet, the uncertainty of this provision cannot carry the significance it did in *Solem*. There, the critical cession language was not suited to finding intent to terminate the reservation.

[¶ 25.] In keeping with the Dawes Act's twenty-five year trust period following the allotting process, setting aside government land for school and agency purposes was common, even for a terminated reservation.[16] In the 1891 treaty with the Sisseton–Whapeton Tribes, it was understood that on the Lake Traverse Reservation, the United States would continue to own land for school and agency purposes. *See DeCoteau*, 420 U.S. at 435 n. 16, 95 S.Ct. at 1088 n. 16 ("Government should own the lands upon which the agency and school building are located."); *id.* at 438 n. 19, 95 S.Ct. at 1089 n. 19 (" 'Indian title' " to lands occupied by the " 'agency and missionary society' " will be " 'extinguished' "(citation omitted)). Moreover, reserving such "lands for Indian schools, religious missions, and service agencies" did not preclude finding congressional intent to disestablish a part of the Rosebud Reservation. *See Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 622, 97 S.Ct. 1361, 1381, 51 L.Ed.2d 660 (1977)(Marshall, J., dissenting).

[¶ 26.] Another provision that bears further scrutiny is Article XIV of the 1894 Act:

All allotments of land in severalty to members of the Yankton tribe of Sioux Indians, not yet confirmed by the Government, shall be confirmed as speedily as possible, correcting any errors in same, and *Congress shall never pass any act alienating any part of these allotted lands from the Indians.*

(emphasis added). This, too, is consistent with the initial twenty-five year trust relationship. At the time of negotiations, much of the land to be allotted had yet to be processed. Though opposed to partitioning their land when the Dawes Act first passed, Yankton tribal members expressed concern during the 1892 negotiations with the slowness of the approval process. A history of broken promises and failures to deliver timely, adequate provisions as part of the 1858 Treaty created understandable Yankton skepticism about whether all the allotments would be distributed. Taken in context, this provision simply assured that those entitled to allotted parcels would receive them as soon as possible, and once received, they would not be taken away. Nothing in this provision can be interpreted as precluding individual Indian owners from later transferring their property to non-Indians after the trust period expired.

[¶ 27.] Even if the more uncertain provisions of the 1894 Act cannot be wholly explained, congressional intent to end the Yankton Reservation is sufficiently clear in its "precisely suited" cession language. As the Supreme Court noted with respect to the Article XVIII saving clause, " 'it is a commonplace of statutory construction that the specific' cession and sum certain language in Articles I and II 'governs the general' terms . . . ." *Yankton Sioux Tribe*, 522 U.S. at 348, 118 S.Ct. at 800 (citation omitted).

## 2. Historical Context

[¶ 28.] Although there are inconsistencies in this sphere also, we find little in the historical context or the Treaty negotia-

---

**16.** After the opening, federal officials provided assistance to help the Yanktons' transition into agriculturists. *See* Hoover & Bruguier, *supra,* at 46.

tions to suggest that the reservation would continue. "[T]he record of the negotiations between the Commissioners and the Yankton Tribe contains no discussion of the preservation of the 1858 boundaries...." *Id.* at 347, 118 S.Ct. at 800.

> [T]he Commissioners' report of the negotiations signaled their understanding that the cession of the surplus lands dissolved tribal governance of the 1858 reservation. They observed that "now that [members of the Tribe] have been allotted their lands in severalty and have sold their surplus land—the last property bond which assisted to hold them together in their tribal interest and estate—their tribal interests may be considered a thing of the past." And, in a March, 1894, letter to the Chairman of the Senate Committee on Indian Affairs, several Yankton chiefs and members of the Tribe indicated that they concurred in such an interpretation of the agreement's impact. The letter urged congressional ratification of the agreement, explaining that the signatories "want[ed] the laws of the United States and the State that we live in to be recognized and observed," and that they did not view it as desirable to "keep up the tribal relation ... as the tribal relation on this reservation is an obstacle and hindrance to the advancement of civilization."

*Id.* at 353, 118 S.Ct. at 802–03 (internal and other citation omitted). Implicit in the negotiations was an opened area without boundaries; explicit was an end to tribal existence upon the distribution of allotments and the sale of unallotted lands. Without tribal existence, without communal land, the historical context points to an understanding that the reservation would no longer continue to exist. As the Supreme Court wrote in *Yankton Sioux Tribe*, "[i]n this case, although the context of the Act is not so compelling that, standing alone, it would indicate diminishment,

neither does it rebut the 'almost insurmountable presumption' that arises from the statute's plain terms." 522 U.S. at 351, 118 S.Ct. at 802 (citation omitted).

### 3. Resultant Developments in the Area

[¶ 29.] We recognize that a "surge in non-Indian settlement" is the "least compelling" proof in our examination of this question. *Id.* at 356, 118 S.Ct. at 804. It was congressional intent in passing the 1894 Act that primarily controls the analysis and not the later movements of settlers and others. Yet we cannot ignore the palpable reality that, as the years passed after the 1895 opening, no one *behaved* as if the reservation remained in existence, not the Federal Government, not the Yankton Sioux, not the State, not the homesteaders, not the townspeople. However carefully we may pore over the thousands of words in treaty negotiations, in chronicles, in agency reports, in statutes, in latter day scholarly exegesis, we cannot ignore the historical actuality of what happened following the opening. The area was utterly transformed.

[¶ 30.] Following a recurrent theme, first came the settlers, then the railroads, then the towns, and businesses. This precipitous change in regional character is undeniable. If not dispositive of the question, it certainly has a persuasive bearing on our decision. Later actions may elucidate what Congress expected and here "the area remains 'predominantly populated by non-Indians with only a few surviving pockets of Indian allotments,' and those demographics signify a diminished reservation." *Id.* at 356–57, 118 S.Ct. at 804 (quoting *Solem*, 465 U.S. at 471 n. 12, 104 S.Ct. at 1167 n. 12).

[¶ 31.] With the opening of the reservation came law and order administered by the State, with few exceptions.[17] No distinction was made between ceded lands and allotted lands that passed out of Indi-

---

**17.** Those exceptions have to do with tribal police and federal officials dealing with mat-

ters on trust lands, which, as we know, quickly dwindled.

an hands. The "single most salient fact [relating to later jurisdictional history] is the unquestioned actual assumption of state jurisdiction...." *Rosebud Sioux Tribe*, 430 U.S. at 603, 97 S.Ct. at 1371. In *Yankton Sioux Tribe*, the Supreme Court considered this factor influential: "The State's assumption of jurisdiction over the territory, almost immediately after the 1894 Act and continuing unchallenged to the present day, further reinforces our holding." 522 U.S. at 357, 118 S.Ct. at 804. The only areas still treated as Indian country were the allotted lands, which remained under Indian ownership. Later, when the Tribe acquired certain lands, they were also considered out of the State's jurisdiction.

[¶ 32.] In the century following the opening of the reservation, the Yanktons themselves referred to their common land or "reservation" as a "mile square." *Greger*, 1997 SD 14, ¶ 5, 559 N.W.2d at 859. At the time of the 1894 Act, this "reservation" was federal agency land, as reserved in Article VIII, not tribal or common land. Even more significantly, both the 1932 Yankton Tribal Constitution and the amended Constitution of 1962 defined the Tribe's property as including only those tribal lands currently owned by the Tribe. Not until 1990 was the Yankton Constitution amended to encompass all lands and waters within the 1858 Treaty boundaries. This belated reclamation cannot overcome a century of development and reliance at odds with it, much less the congressional intent in the 1894 Act.

[¶ 33.] We see little evidence to depart from our previous conclusion on this point in *Greger*.

Today, less than ten percent of the land within the 1858 Treaty boundaries is trust land. Over 600 miles of road in the area are maintained by county and township authorities. Only 22 miles are maintained by the Bureau of Indian Affairs. The state-chartered municipalities of Wagner, Lake Andes, Dante, Pickstown, Ravinia, and Marty all lie within the former boundaries. Non–Indians comprise over two-thirds of the population in the area.

\* \* \*

[I]f we accept defendant's arguments, over 6000 citizens of Charles Mix County would presently find they have become residents of an Indian reservation. This region has not been considered a reservation by the general populace.

*Greger*, 1997 SD 14, ¶¶ 29, 30, 559 N.W.2d at 867. Dante, Lake Andes and Ravinia are on former allotments. Pickstown and Wagner are partly situated on former allotments. The Charles Mix County seat (the courthouse and law enforcement center) are located on former allotment land.

[¶ 34.] Our Court has repeatedly held that South Dakota has jurisdiction over both ceded unallotted land and allotted parcels no longer titled in Indian ownership. In *Wood v. Jameson*, 81 S.D. 12, 130 N.W.2d 95, 99 (1964), we discerned a congressional purpose "to disestablish the reservation and restore to the public domain the lands therein with the exception of allotments in severalty." Thus we concluded that an offense at Lake Andes was not committed within Indian country. In *State v. Williamson*, 87 S.D. 512, 211 N.W.2d 182, 184 (1973), we held that "the Act of 1894 disestablished that portion of the Yankton Reservation which was ceded and sold to the United States," including the cities of Lake Andes and Wagner. *Cf. State v. Winckler*, 260 N.W.2d 356, 360 (S.D.1977)(Yankton Sioux Tribe Pork Plant at Wagner is trust land, thus, Indian country).

[¶ 35.] A conclusion that, despite present ownership, all originally allotted land is part of a reservation creates new federal, tribal and state jurisdictional lines within Charles Mix County and its communities that not only affect law enforcement matters, but innumerable other issues both momentous and mundane: taxation, licensing, voting, economic development, environmental protection. To turn back now,

to hold that the reservation was not terminated when for so many years that has been legal conception of both Indians and non-Indians, would create a jurisdictional maze, and defeat "the justifiable expectations of the people living in the area." *Hagen*, 510 U.S. at 421, 114 S.Ct. at 970.

### G

■ [¶ 36.] Paralleling the Act of 1894 under consideration here is the 1891 Act terminating the Lake Traverse Indian Reservation as decided in *DeCoteau. Yankton Sioux Tribe*, 522 U.S. at 344–45, 118 S.Ct. at 798. It is difficult to find any jural distinction between the two reservation sales. Even in 1892, the negotiators for the Yankton agreement repeatedly referred back to the Sisseton–Whapeton agreement, expressing their intent to effect the same result. In the end, pursuant to the General Allotment Act, both reservations were, in the same time frame, parceled to individual Indians, and all unallotted lands were sold to the United States. Both Acts used the same cession language: "cede, sell, relinquish and convey...." The intent behind this language is unmistakably the same.

[¶ 37.] Like the 1891 Act, "[t]he 1894 Act contains the most certain statutory language, evincing Congress' intent to diminish the Yankton Sioux Reservation by providing for total cession and fixed compensation." *Yankton Sioux Tribe*, 522 U.S. at 357, 118 S.Ct. at 805; *see DeCoteau*, 420 U.S. at 445–46, 95 S.Ct. at 1093–94. In each instance, *all* unallotted lands were sold. With both treaties, the heart of the preamble language recited intent "to dispose of a portion of the land set aside and reserved" to them. On both reservations, the opened lands were subject to the homestead and townsite laws of the United States. In both cases, the United States retained an agency and schools. Most significantly, no land in common was retained, no boundaries were redefined, and the parcels allotted to Indians were in both instances spread random-ly across the former reservations. *Yankton Sioux Tribe*, 522 U.S. at 334–40, 118 S.Ct. at 793–96; *DeCoteau*, 420 U.S. at 428, 95 S.Ct. at 1085. In both Acts, it was provided that "excepting the sixteenth and thirty-sixth sections ... shall be reserved for common school purposes, and be subject to the laws of" the State. The proclamations opening the reservations each referred to a "schedule of lands within the ... reservation...." Upon opening the land for settlement, in both instances South Dakota assumed unchallenged jurisdiction in all areas except on trust lands. *Yankton Sioux Tribe*, 522 U.S. at 357, 118 S.Ct. at 804; *DeCoteau*, 420 U.S. at 442, 95 S.Ct. at 1092. The *DeCoteau* Court perceived these circumstances to signal congressional intent to terminate the reservation and restore the land to the public domain. We believe the same intent is shown in the Yankton Reservation sale.

### Conclusion

■ [¶ 38.] The place in Pickstown where Bruguier committed his crime lies on land within the original 1858 boundaries of the Yankton Sioux Reservation. This area was initially allotted to a member of the Yankton Sioux Indian Tribe, but was later sold in fee to a non-Indian. Pickstown was created in 1946 as a federal reserve for the U.S. Army Corps of Engineers. Congress later relinquished ownership of this townsite to Pickstown's municipal corporation. It appears that Congress did not consider this area Indian country or an existing Indian reservation. Nonetheless, to comply with Supreme Court jurisprudence in deciding if this area is Indian country, we further considered the matter under the traditional principles the Court instituted.

[¶ 39.] Our analysis requires us to interpret a Nineteenth Century treaty, negotiated, enacted and enforced under outmoded values and discarded beliefs. In *Greger*, we refrained from interpreting the 1894 Act any broader than necessary. The Supreme Court in *Yankton Sioux Tribe* likewise decided only that the ceded

portion of the reservation was diminished. Today we proceed further to decide the jurisdictional status of former allotments.

[¶ 40.] We conclude that Pickstown is not Indian country under 18 USC § 1151. It is not situated within the boundaries of a reservation because the Yankton Sioux Reservation was effectively terminated by the 1894 Act. Nor is it trust land, a dependent Indian community, or property held by the Tribe. Consequently, the State properly exercised jurisdiction over Bruguier and the circuit court correctly denied his habeas corpus petition.

[¶ 41.] Affirmed.

[¶ 42.] MILLER, Chief Justice, and SABERS, AMUNDSON, and GILBERTSON, Justices, concur.

