#31006, #31007-a-RG

**2026 S.D. 19**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

v.

HAZEN HUNTER WINCKLER,                    Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FIRST JUDICIAL CIRCUIT
CHARLES MIX COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE BRUCE V. ANDERSON
Judge

* * * *

THOMAS P. REYNOLDS of
Kennedy Pier Loftus Reynolds & Brandt, LLP
Yankton, South Dakota                    Attorneys for defendant and
                                         appellant.


MARTY J. JACKLEY
Attorney General

JACOB R. DEMPSEY
Assistant Attorney General
Pierre, South Dakota                     Attorneys for plaintiff and
                                         appellee.

* * * *

CONSIDERED ON BRIEFS
JANUARY 12, 2026
OPINION FILED **03/11/26**

#31006, #31007

GUSINSKY, Justice

[¶1.] A jury convicted Hazen Hunter Winckler of failing to appear for a pretrial conference at the Charles Mix County courthouse. Winckler appeals his failure to appear conviction in Appeal No. 31006. In a separate, unrelated criminal matter, Winckler pleaded guilty to the crime of simple assault after an altercation with another inmate at the Charles Mix County jail. Winckler appeals his simple assault conviction in Appeal No. 31007. Both appeals present jurisdictional challenges in which Winckler alleges that the Charles Mix County courthouse and jail are situated in Indian country, thus depriving the State of subject matter jurisdiction over Winckler, an enrolled member of the Yankton Sioux Tribe. Appeal No. 31006 contains additional challenges to Winckler's conviction. For purposes of this opinion, we consider together the arguments made in Appeals Nos. 31006 and 31007.[1] We affirm both convictions.

## Factual and Procedural History

### *Failure to appear charge*

[¶2.] Winckler was charged with failure to appear in the First Judicial Circuit, Charles Mix County, South Dakota, on November 13, 2023, for failing to appear at a pretrial conference in a then-pending felony case on November 8, 2023. A warrant was subsequently issued for Winckler's arrest, and he was arrested on January 28, 2024. Winckler claims he appeared before a magistrate judge two days

---

1. Attorney Tucker Volesky represented Winckler in both trials and submitted the appellate briefs. Prior to the conference on these cases, Mr. Volesky was suspended from the practice of law. Attorney Thomas P. Reynolds was appointed to represent Winckler during the pendency of these appeals.

later on January 30, 2024.  In support, Winckler cites an eCourts summary of the case suggesting an initial appearance was held on January 30, 2024.  But the circuit court found no such initial appearance occurred because Winckler refused to participate, and no transcript of any such initial appearance exists.

[¶3.]        On either January 28 or January 30, 2024, Winckler told the clerk he would proceed pro se.[2]  The magistrate court scheduled a preliminary hearing for February 13, 2024, but, during this hearing, Winckler changed his mind about proceeding pro se and requested court-appointed counsel.  Based on this request, the magistrate court found good cause for the delay and set the preliminary hearing for February 27, 2024.  In the meantime, a grand jury indicted Winckler on one count of failure to appear, a Class 6 felony, on February 22, 2024.

[¶4.]        As a result of this indictment, Steve Cotton, the Charles Mix County State's Attorney, mailed Winckler a letter informing him that his preliminary hearing in magistrate court had been cancelled, and that an arraignment date was set for March 11, 2024.  While awaiting arraignment, Winckler refused to speak with his court-appointed counsel, Keith Goehring, or leave his jail cell.  In an email from the judge to Clerk Magistrate Jennifer Robertson, the judge described the conflict: "Keith spoke to me about this situation late last week and that Mr. Winckler continues to refuse to talk to him.  It is obvious an irreconcilable conflict exists that cannot be mended."  In this same email thread, Robertson explained that

---

2.    Due to the lack of a transcript or recorded communications, it is unclear from the record whether this communication occurred on January 28, when Winckler was arrested, or on January 30, when he claims his initial appearance was.

Winckler "refused to have initial rights read to him" and "wouldn't come out of his cell." Because of this refusal, Robertson explained that Winckler "hasn't had his initial appearance." The circuit court allowed Keith Goehring to withdraw and appointed new counsel, Tucker Volesky, on March 11, 2024.

[¶5.]     Winckler's arraignment was then continued from the original March 11 date and was held on April 8, 2024. At this point, the circuit court determined "most of the delay" in the case was attributable to Winckler in "refusing to allow the clerk to complete his initial appearance, his delay in getting Court appointed counsel for his preliminary hearing, and his letter motion . . . requesting substitute counsel and the Court's consideration and resolution of that request." The circuit court subsequently scheduled trial for August 19, 2024.

[¶6.]     Winckler filed two pretrial motions to dismiss the action on August 14, 2024. First, Winckler filed a motion to dismiss for violation of the 180-day rule pursuant to SDCL 23A-44-5.1. The circuit court issued a memorandum opinion denying Winckler's motion. Second, Winckler re-filed a motion to dismiss,[3] alleging that his status as an Indian, coupled with his argument that the charged conduct occurred in Indian country, deprived the circuit court of jurisdiction. It was agreed between the parties that all cases pending against Winckler at the time would be continued until the circuit court could resolve Winckler's August 2024 motions, and trial was rescheduled for December 13, 2024.

---

3.     The record indicates that Winckler initially filed this motion on June 19, 2024, but that it was re-filed on August 14, 2024.

[¶7.]     The circuit court held a hearing on the issue of jurisdiction on September 11, 2024.  The parties stipulated to the historical facts related to the title of the land at issue.  This included stipulations to the fact that Winckler is an enrolled member of the Yankton Sioux Tribe, and to the fact that the alleged offense occurred on land that was originally included in the Yankton Sioux Reservation created in the 1858 Treaty between the Yankton Sioux Tribe and the United States—land later allotted to a tribal member.  Thus, at issue was whether the lands in question qualified as Indian country under 18 U.S.C. § 1151.  After the hearing, the circuit court issued a memorandum decision denying Winckler's motion to dismiss for lack of jurisdiction on October 11, 2024.

[¶8.]     Prior to trial, Winckler objected to the introduction of several pieces of evidence.  Winckler first objected to the admission of the State's Exhibit 1, primarily on the grounds that the exhibit contained inadmissible hearsay statements and violated his right to confront witnesses.  Exhibit 1 included Winckler's bond form paperwork and standard conditions of bond.  The following statement was included on page 1: "Defendant shall appear in court in Charles Mix County, on 11/08/23 01:30 PM, and at such other places and times as this court may order or direct." The document was printed on Charles Mix County Sheriff's Office letterhead and included the signature of both Winckler and the bond provider, but included no certification or signature by the circuit court.  The circuit court held the relevant portions of Exhibit 1 to be admissible under the business records exception to the hearsay requirement.  Additionally, the circuit court ruled that none of the

statements in Exhibit 1 were testimonial, so Winckler's constitutional right to confront witnesses was not violated.

[¶9.]      Second, Winckler objected to the State's Exhibit 5, a transcript of the pretrial conference, on attorney-client privilege grounds.  The transcript included a reference to a letter that Goehring, Winckler's previous counsel, sent to Winckler advising him of what time the hearing was on November 8, 2023.  Winckler argued this communication was confidential and that any reference to the letter violated the attorney-client privilege and confidential communication protections.  Winckler additionally objected to Goehring's status as a witness and requested the court prohibit Goehring from testifying at trial on attorney-client privilege grounds.  The circuit court rejected Winckler's arguments and admitted the transcript with several redactions and allowed Goehring to testify as a witness at trial.

[¶10.]      The circuit court held a jury trial on Winckler's failure to appear charge on December 13, 2024.  At trial, the State called two witnesses: Clerk Robertson and Attorney Goehring.  The State first introduced Exhibit 2, which was a standard order setting the date and time for a jury trial.  The order contained the following sentence: "It is further ordered that all perfunctory pretrial motions shall be filed and served upon counsel with sufficient notice to be heard at the pretrial conference set for the 8th day of November, 2023, at 1:30 p.m."

[¶11.]      The State next introduced Exhibit 1, the relevant portions of Winckler's bond form, through Robertson, who testified to its contents over Winckler's objections.  Robertson read into evidence a sentence that appeared on the bond form: "Defendant shall appear in court in Charles Mix County on 11-8-

2023 at 1:30 p.m."[4]  The bond form was printed on Charles Mix County Sheriff's Office letterhead and was not issued nor signed by the court.

[¶12.]     The State then called Goehring, who testified primarily about Winckler's presence during his arraignment hearing and the events of November 8, 2023.  Specifically, Goehring read lines from the arraignment hearing transcript: "I did send him a letter at the last known mailing address last Friday, advising him to be here today.  But again, he's not here.  So."  Winckler objected to this testimony and to portions of Goehring's statements in State's Exhibit 5 on privilege and confidentiality grounds.

[¶13.]     At the close of evidence, Winckler moved for a judgment of acquittal. The circuit court denied the motion, finding "sufficient evidence in the record to raise a question for the jury to decide whether or not Mr. Winckler knew he had court and what date and time and where."  The case was submitted to the jury, and the jury returned a verdict finding Winckler guilty on the charge of failure to appear under SDCL 23A-43-31.  Winckler later entered a stipulation and agreement admitting to the part II habitual offender information, enhancing the statutory maximum sentence for the Class 6 felony failure to appear offense to that of a Class 4 felony.  The circuit court sentenced him to a term of six years suspended upon certain conditions and the payment of court costs.

---

4.     In his brief, Winckler argues that on cross-examination, Robertson acknowledged the court's bond order did not include any condition that Winckler needed to appear before the court on November 8, 2023.  But this was an admission related to defense Exhibit A, which was an email relaying the initial bond set by a magistrate judge.  The bond order, which was issued at Winckler's arraignment hearing, included the condition that Winckler "shall appear" before the court on November 8, 2023.

***Simple assault charge***

[¶14.] Winckler was charged with simple assault on April 4, 2024, after a physical altercation with another inmate at the Charles Mix County jail. Winckler filed a motion to dismiss on the same jurisdictional grounds made in Appeal No. 31006. The circuit court denied the motion, determining the Charles Mix County jail does not sit in "Indian country" as defined by federal law. Winckler thereafter signed a stipulation and agreement stipulating to the factual basis of the charge. After adjudicating him guilty of simple assault, the circuit court sentenced Winckler to time served and payment of court costs.

[¶15.] Winckler appeals both convictions, raising the following issues, which we restate as follows:

> 1. Whether the circuit court erred when it denied Winckler's motion to dismiss for lack of jurisdiction based on his claim that the Charles Mix County courthouse and jail are not in Indian country.
>
> 2. Whether the circuit court erred in determining the 180-day period within which to hold a trial had not run.
>
> 3. Whether the circuit court abused its discretion in admitting State's Exhibit 1 over Winckler's objections.
>
> 4. Whether the circuit court abused its discretion in admitting Keith Goehring's testimony and prior statements.
>
> 5. Whether the circuit court erred in denying Winckler's motion for judgment of acquittal.

Issue 1 is raised in Appeals Nos. 31006 and 31007, while issues 2–5 are raised in Appeal No. 31006 only.

## Analysis and Decision

### 1. Whether the circuit court erred when it denied Winckler's motion to dismiss for lack of jurisdiction based on his claim that the Charles Mix County courthouse and jail are not in Indian country.

[¶16.] Winckler moved to dismiss both cases by challenging the jurisdiction of the Charles Mix County circuit court, alleging both the Charles Mix County courthouse and jail sit atop land that qualifies as Indian country under 18 U.S.C. § 1151. The circuit court determined it had jurisdiction over both of Winckler's cases because neither the courthouse nor the jail were situated in Indian country.

### Standard of Review

[¶17.] "Motions to dismiss for lack of subject matter jurisdiction fall into one of two categories: (1) facial attacks on allegations of subject matter jurisdiction within the complaint; or (2) disputes regarding the facts upon which subject matter jurisdiction rests." *Alone v. C. Brunsch, Inc.*, 2019 S.D. 41, ¶ 11, 931 N.W.2d 707, 710–11. Winckler's motion to dismiss was based on the second category—a factual attack on the circuit court's subject matter jurisdiction. To resolve a factual attack on jurisdiction, "the circuit court does not assume the allegations in the complaint are accurate[,]" and it "is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Id.* ¶ 12, 931 N.W.2d at 711 (quoting *Osborn v. United States*, 918 F.2d 724, 730 (8th Cir. 1990)). "Questions of jurisdiction are legal questions reviewed under a de novo standard." *State v. Bettelyoun*, 2022 S.D. 14, ¶ 16, 972 N.W.2d 124, 128–29 (quoting *State v. Owen*, 2007 S.D. 21, ¶ 10, 729 N.W.2d 356, 362). "However, a circuit court's findings of fact 'cannot be disturbed unless they are clearly erroneous.'" *Alone*, 2019 S.D. 41,

¶ 12, 931 N.W.2d at 711 (quoting *Ainsworth v. Erck*, 388 N.W.2d 886, 888 (S.D. 1986)).

### Historical Overview

[¶18.]     The land at issue here has been the subject of much litigation over the last century.  A historical overview of the Yankton Sioux Reservation and the land on which the Charles Mix County courthouse and jail are situated is necessary for context.  The United States Supreme Court described the history of the Yankton Sioux Reservation in *South Dakota v. Yankton Sioux Tribe*:

> At the outset of the 19th century, the Yankton Sioux Tribe held exclusive dominion over 13 million acres of land between the Des Moines and Missouri Rivers, near the boundary that currently divides North and South Dakota.  In 1858, the Yanktons entered into a treaty with the United States renouncing their claim to more than 11 million acres of their aboriginal lands in the north-central plains. [. . .]
>
> The retained portion of the Tribe's lands, located in what is now the southeastern part of Charles Mix County, South Dakota, was later surveyed and determined to encompass 430,405 acres. In consideration for the cession of lands and release of claims, the United States pledged to protect the Yankton Tribe in their "quiet and peaceable possession" of this reservation and agreed that "[n]o white person," with narrow exceptions, would "be permitted to reside or make any settlement upon any part of the [reservation]."  The Federal Government further promised to pay the Tribe, or expend for the benefit of members of the Tribe, $1.6 million over a 50-year period, and appropriated an additional $50,000 to aid the Tribe in its transition to the reservation[.]

522 U.S. 329, 333–34 (1998) (first & second alterations in original) (citations omitted).

[¶19.]     We addressed the history that followed in *Bruguier v. Class*:

> With the passage of the General Allotment (Dawes) Act in 1887, the Yankton Reservation was to be partitioned with parcels to

> be assigned to individual tribal members.  In 1892, the Tribe
> and the United States negotiated a second treaty, which
> Congress ratified in 1894.  By this agreement, for a "sum
> certain," the Tribe "ceded, sold, relinquished and conveyed" all
> its unallotted reservation lands to the United States.

1999 S.D. 122, ¶ 4, 599 N.W.2d 364, 366 (footnote omitted) (citations omitted).  The

Court in *State v. Greger* also discussed this history:

> Beginning in 1891, tracts within the reservation were allotted to
> individual Yankton Indians, leaving approximately 168,000
> acres of unallotted land.  The next year, in response to
> communications from the Tribe to the Secretary of the Interior,
> the United States appointed the Yankton Indian Commission to
> negotiate for the sale of the surplus lands. [. . .]
>
> After months of negotiation, a majority of the male tribal
> members and the Commission reached agreement.  The first two
> articles provided:
>
> > **Article I.**
> >
> > The Yankton tribe of Dakota or Sioux Indians hereby
> > cede, sell, relinquish, and convey to the United States all
> > their claim, right, title, and interest in and to all the
> > unallotted lands within the limits of the reservation set
> > apart to said Indians as aforesaid.
> >
> > **Article II.**
> >
> > In consideration for the lands ceded, sold, relinquished,
> > and conveyed to the United States as aforesaid, the
> > United States stipulates and agrees to pay to the said
> > Yankton tribe of Sioux Indians the sum of six hundred
> > thousand dollars ($600,000), as hereinbefore provided for.
> >
> > [. . . ]
>
> [T]he unallotted lands were declared available for non-Indian
> settlement effective May 21, 1895.  That same year, South
> Dakota took over civil and criminal jurisdiction in the region
> and has since continuously maintained it.

1997 S.D. 14, ¶¶ 3–4, 559 N.W.2d 854, 857–59 (footnotes omitted).

[¶20.]     The Charles Mix County courthouse and jail located in Lake Andes,

South Dakota, sit atop lands that were originally allotted to a Yankton Sioux Tribe

member, but title has since passed out of Indian ownership and into non-Indian

possession.  We conducted an in-depth discussion of the history of this land in

*Bruguier*:

> After President Cleveland's proclamation opened the unallotted lands for settlement in 1895, the area filled with settlers.  The history is recounted in the writings of author and journalist, Adeline S. Gnirk.  In her retelling, the Chicago, Milwaukee & St. Paul Railroad secured a right-of-way in 1897 to extend its line through the opened reservation from Napa to the place where the town of Platte was later founded.  The railbed was completed in 1900.  Within a year four townsites originated along the railway: Wagner, Lake Andes, Geddes, and Platte. . . . Typical perhaps is the rise of Lake Andes, which was platted in 1901 and formally established as a town in 1904.
>
> When inherited Indian lands commenced to be sold, a location was secured on Section 4, the present site.  This land including the 80 acres then platted and the 120 acres adjoining had been allotted to John Arthur, or Sparrow Hawk.  He died and in 1904 his only heirs, his wife Taniyawakanwin, and daughter Bessie Zitka Koyewin were induced to sell 80 acres of this land to the Lake Andes Townsite Company.
>
> Even during the twenty-five year trust period required by the Dawes Act, Article XI of the 1894 Act allowed for the sale of allotted lands on the death of certain allottees.  By 1916, Lake Andes won a decade-long battle with the other railroad towns to become the county seat, replacing Wheeler.  Construction on the new courthouse began in 1917.  The town remains the county seat to this day.  Its courthouse and law enforcement center both sit on formerly allotted land.

1999 S.D. 122, ¶ 5, 599 N.W.2d at 366–67 (footnote omitted) (citations omitted).

*Analysis*

[¶21.]     Under 18 U.S.C. § 1151, the term "Indian country" includes:

> (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

We previously "interpreted 18 U.S.C. § 1151 to mean that subsection (a) encompasses those areas *within* a reservation, and that subsection (c) applies to those lands standing *outside* reservation boundaries." *Bruguier*, 1999 S.D. 122, ¶ 16, 599 N.W.2d at 371 (emphasis added) (citing *State ex rel. Hollow Horn Bear v. Jameson*, 77 S.D. 527, 95 N.W.2d 181 (1959)). Winckler argues the Charles Mix County courthouse and jail are in Indian country under all three subsections, and we address each in turn.

            a.     *Subsection (a)*

[¶22.]     With regard to his arguments under § 1151(a), Winckler suggests this Court "should depart from its Indian country precedents which determined the Yankton Sioux Reservation was 'disestablished' and its lands no longer constitute Indian country under 18 U.S.C. § 1151(a)." Most relevant to this issue is our decision in *Bruguier*, where we addressed the status of land within the 1858 boundaries of the Yankton Sioux Tribe. 1999 S.D. 122, 599 N.W.2d 364.

[¶23.]     In that case, Bruguier committed burglary in Pickstown, South Dakota, which lies within the original 1858 boundaries of the Yankton Sioux

Reservation. *Id.* ¶ 2, 599 N.W.2d at 365. Much of the land that Pickstown now sits atop "is former allotment land, [but] none of it is now held by the Tribe or in trust." *Id.* ¶ 8, 599 N.W.2d at 367. As in the present case, the parties in *Bruguier* stipulated that the burglary "occurred on allotted land to which Indian title had been extinguished," leaving only the question of "whether the land remained Indian country under federal law." *Id.* ¶ 3, 599 N.W.2d at 366.

[¶24.] Identical to Winckler's argument in the present case, "Bruguier contend[ed] that whatever their present ownership, all originally[-]allotted lands maintain Indian country status under 18 USC § 1151(a), as they lie within the 1858 boundaries of the Yankton Sioux Indian Reservation." *Id.* ¶ 14, 599 N.W.2d at 370. In response, the State argued "that the reservation was disestablished by the 1894 Act, leaving as Indian country only Indian retained allotments and tribally owned land." *Id.*

[¶25.] In *Bruguier*, we affirmed the circuit court's finding that "the [Yankton Sioux] reservation had been disestablished and that no lands within the former 1858 boundaries now constitute a reservation under 18 USC § 1151[.]" *Id.* ¶ 3, 599 N.W.2d at 366. In doing so, we held that "allotted lands, which have passed into non-Indian ownership" are "not Indian country as defined by federal law." *Id.* ¶ 1, 599 N.W.2d at 365.

[¶26.] Under our binding precedent in *Bruguier*, the land at issue in the present case cannot qualify as Indian country under 18 U.S.C. § 1151(a) because Lake Andes is not situated within the boundaries of an Indian reservation. *See id.* ¶ 40, 599 N.W.2d at 378. Not only that, but the land at issue was formerly allotted

land that passed to non-Indian ownership, extinguishing its status as Indian country. *See id.* ¶ 1, 599 N.W.2d at 365. Because this Court has already decided the issue at hand, Winckler's argument implicates principles of stare decisis.

**Stare decisis**

[¶27.] "The doctrine of stare decisis exists as a prudential means of promoting stability in the law by adhering to the holdings in our prior decisions and regarding them as precedential." *In re Noem*, 2024 S.D. 11, ¶ 48, 3 N.W.3d 465, 479. Under this doctrine, we generally adhere to and follow our own precedent. But when the Court is "convinced that a decision was wrongly decided," we may correct such error. *Id.*

[¶28.] We consider five factors when deciding whether to depart from precedent: "(1) the quality of [the] prior decision's reasoning; (2) the workability of the prior rule established by its precedent; (3) the consistency of the prior decision with other related decisions; (4) subsequent developments since the erroneous decision; and (5) the extent of the reliance on the earlier decision." *Earll v. Farmers Mut. Ins. Co. of Neb.*, 2025 S.D. 20, ¶ 33, 19 N.W.3d 536, 545 (alteration in original) (quoting *In re Noem*, 2024 S.D. 11, ¶ 50, 3 N.W.3d at 480). This Court approaches "the question of whether to depart from precedent with great caution and restraint." *In re Noem*, 2024 S.D. 11, ¶ 48, 3 N.W.3d at 479 (citation omitted).

[¶29.] Winckler questions this Court's decision in *Bruguier*,[5] coining it "problematic" and "unworkable." We find just the opposite. *Bruguier*, to the extent

---

5.     Winckler separated his 18 U.S.C. § 1151 arguments between his briefs in Appeals No. 31006 and No. 31007. Appeal No. 31006 on the failure to appear

(continued . . .)

that it creates precedent for the current case, is a well-reasoned opinion that remains good law. The Court directly addressed the plain language of cession in the 1894 Act and discussed the implications on the Yankton Sioux Reservation. Overturning our opinion in *Bruguier* would result in a declaration that over half of Charles Mix County is still reservation land. This is inconsistent with the above-mentioned treaties, historical developments, and precedents. Moreover, the State has relied extensively on these precedents to prosecute cases in Charles Mix County. And while we recognize that reliance is arguably the least important factor in our analysis, it is nevertheless a factor we must consider.

[¶30.]      *Bruguier* is also consistent with other opinions that determined Lake Andes, and more specifically the portion of land on which the Charles Mix County courthouse sits, is not a part of the Yankton Sioux Reservation. *See Greger*, 1997 S.D. 14, ¶¶ 29–31, 559 N.W.2d at 867; *see also State v. Williamson*, 87 S.D. 512, 515, 211 N.W.2d 182, 184 (1973) ("[W]e hold that the Act of 1894 disestablished that portion of the Yankton Reservation which was ceded and sold to the United States, and which embodied the land upon which the cities of Lake Andes and Wagner are located."). Admittedly, *Bruguier* goes further than the related Eighth Circuit opinions that hold the Yankton Sioux Reservation was diminished rather than

_____

(. . . continued)

charge addressed subsections (b) and (c), while Appeal No. 31007 on the simple assault charge addressed subsection (a). Winckler only makes mention of *Bruguier* and requests we overrule it in the simple assault case. Because we consider these two appeals jointly, we address all his jurisdictional arguments in both cases.

disestablished.[6] *See Yankton Sioux Tribe v. Gaffey*, 188 F.3d 1010, 1020–21, 1030 (8th Cir. 1999); *Yankton Sioux Tribe v. U.S. Army Corps of Engineers*, 606 F.3d 895, 897, 899–900 (8th Cir. 2010). But our disestablishment holding in *Bruguier* is not at issue here.

[¶31.] Rather, the narrow question we are faced with in this case is whether previously-allotted lands which passed out of Indian ownership qualify as Indian country under federal law. *Bruguier* clearly holds they do not, as do the federal courts that have had occasion to consider this issue. *See Gaffey*, 188 F.3d 1010 (holding the Yankton Sioux Reservation was further diminished when allotted lands passed out of Indian ownership); *U.S. Army Corps of Engineers*, 606 F.3d at 897; *Bruguier*, 1999 S.D. 122, ¶ 40, 599 N.W.2d at 378.

[¶32.] Winckler cites the recent Supreme Court decision in *McGirt v. Oklahoma* to support his assertion that *Bruguier* requires revisitation. 591 U.S. 894 (2020). Relevant to this matter, *McGirt* held that disestablishment requires that Congress clearly express its intent to do so, commonly with an explicit reference to cession or other language evidencing the present and total surrender of all tribal interests. *Id.* at 904. Winckler argues the Court in *Bruguier* considered evidence outside of congressional acts in reaching its conclusion, and that it is

---

6.      We are not bound by Eighth Circuit Court of Appeals decisions, but rather "possess the authority, absent a provision for exclusive federal jurisdiction, to render binding judicial decisions" in line with our "own interpretations of federal law." *ASARCO Inc. v. Kadish*, 490 U.S. 605, 617 (1989); *see also Greger*, 1997 S.D. 14, ¶ 6 n.5, 559 N.W.2d at 859 n.5 (quoting the same language from *Kadish*); *Johnson v. Williams*, 568 U.S. 289, 305 (2013) (explaining that the "courts of appeals do not bind" state supreme courts when they decide "a federal constitutional question, and disagreeing with the lower federal courts is not the same as ignoring federal law").

therefore inconsistent with *McGirt*.[7]  But in *Bruguier*, we considered the plain language of the 1858 Treaty and the 1894 Act, ultimately concluding the reservation was disestablished because there was no boundary provision in the 1894 Act.  *Bruguier*, 1999 S.D. 122, ¶ 17, 599 N.W.2d at 371.

[¶33.]          Finally, Winckler argues overruling *Bruguier* would not disrupt any reliance interests, but would instead clarify this area of the law and bring it into harmony with other precedent.  But with respect to the narrow question posed in Winckler's appeals, the Eighth Circuit Court of Appeals has held that allotted lands that passed out of Indian ownership are not part of the Yankton Sioux Indian Reservation under 18 U.S.C. § 1151(a).  *Gaffey*, 188 F.3d 1010 (holding the Yankton Sioux Reservation was further diminished when allotted lands passed out of Indian ownership); *U.S. Army Corps of Engineers*, 606 F.3d at 897; *Bruguier*, 1999 S.D. 122, ¶ 40, 599 N.W.2d at 378.  Though less expansive, these opinions are consistent with our holding in *Bruguier* that the reservation was, at the very least, diminished when allotted lands passed out of Indian ownership.  Therefore, Winckler's arguments regarding jurisdiction fail under our precedent as well as under the less expansive view taken by the Federal Courts.

---

7.      We note that *McGirt* also reaffirms the principle that "[u]nder our Constitution, States have no authority to reduce federal reservations lying within their borders. . . . '[O]nly Congress can divest a reservation of its land and diminish its boundaries.'"  591 U.S. at 903–04 (quoting *Solem v. Bartlett*, 465 U.S. 463, 470 (1984)).  However, we do not interpret this principle to mean that state supreme courts have no power to *interpret* congressional and constitutional acts affecting federal reservations, which is what this Court did in *Bruguier* and has done since the establishment of federal Indian reservations in South Dakota.  *See id.* at 949 (Roberts, C.J., dissenting) ("No one argues that courts can 'adjust[]' reservation borders." (alteration in original) (citation omitted)).

[¶34.] For the reasons discussed above, we decline to overrule our prior precedent in *Bruguier*. The Charles Mix County courthouse and jail, which sit on formerly allotted lands that have passed into non-Indian ownership, are not on an Indian reservation as defined by 18 U.S.C. § 1151(a), and accordingly do not qualify as Indian country under this subsection.

    b.  *Subsection (b)*

[¶35.] Winckler next argues that the land at issue and the surrounding community qualify as a dependent Indian community under § 1151(b). 18 U.S.C. § 1151(b) defines Indian country as "all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state[.]" This subsection "refers to a limited category of Indian lands that are neither reservations nor allotments, and that satisfy two requirements." *Alaska v. Native Vill. of Venetie Tribal Gov't*, 522 U.S. 520, 527 (1998). The land must (1) "have been set aside by the Federal Government for the use of the Indians as Indian land;" and (2) it "must be under federal superintendence." *Id.* The land at issue here meets neither requirement.

### Set-aside requirement

[¶36.] "The federal set-aside requirement ensures that the land in question is occupied by an 'Indian community[.]'" *Id. at* 531. In *Venetie*, the Neets'aii Gwich'in Indians, who call the Village of Venetie home, sought status as a "dependent Indian community" under 18 U.S.C. § 1151(b). *Id.* at 523, 525. The Neets'aii Gwich'in lived on a designated reservation from 1943 to 1971. *Id.* But in 1971, Congress

-18-

enacted the Alaska Native Claims Settlement Act (ANCSA), causing the transfer of about $962 million and 44 million acres of land previously set aside for Alaska Natives to private, state-chartered corporations with Native Alaskan shareholders. *Id.* at 523–24.

[¶37.] Pursuant to ANCSA, two Native corporations were established for the Neets'aii Gwich'in, one in Venetie and another in Artic Village. *Id.* at 524. The United States then transferred title of the land constituting the former Venetie Reservation to the corporations, and the corporations transferred title to the Native Village of Venetie Tribal Government. *Id.* The transfers were made in fee simple, and the corporations received the land free from any federal restrictions on use or alienation. *Id.* at 524, 533.

[¶38.] In deciding whether to classify these lands as a "set-aside" for an Indian community under 18 U.S.C. § 1151(b), the Supreme Court held: "Because Congress contemplated that non-Natives could own the former Venetie Reservation, and because the Tribe is free to use it for non-Indian purposes, we must conclude that the federal set-aside requirement is not met." *Id.* at 533.

[¶39.] Similarly, in the present case, the land in question was previously set aside by the Federal Government for use by the Yankton Sioux Indians, but its status changed when it was sold in fee simple to a non-Indian. *See Bruguier*, 1999 S.D. 122, ¶¶ 4–5, 599 N.W.2d at 366–67. Because the formerly allotted lands that the Charles Mix County courthouse and jail sit atop are held in fee, are freely alienable, and are not held in trust by the Federal Government for the benefit of Indians, Winckler cannot satisfy the set-aside requirement of 18 U.S.C. § 1151(b).

*Federal superintendence requirement*

[¶40.]      "[T]he federal superintendence requirement guarantees that the Indian community is sufficiently 'dependent' on the Federal Government [so] that the Federal Government and the Indians involved, rather than the States, are to exercise primary jurisdiction over the land in question."  *Venetie*, 522 U.S. at 531 (footnote omitted).  The Supreme Court has found federal superintendence several times.

> In each of those cases, the Federal Government actively controlled the lands in question, effectively acting as a guardian for the Indians.  *See United States v. McGowan*, [302 U.S. 535, 537–39 (1938)] (emphasizing that the Federal Government had retained title to the land to protect the Indians living there); *United States v. Pelican*, [232 U.S. 442, 447 (1914)] (stating that the allotments were "under the jurisdiction and control of Congress for all governmental purposes, relating to the guardianship and protection of the Indians"); *United States v. Sandoval*, 231 U.S. [28, 37 n.1 (1913)] (citing federal statute placing the Pueblos' land under the "'absolute jurisdiction and control of the Congress of the United States'").

*Venetie*, 522 U.S. at 533–34.  Most relevant in this case, the Eighth Circuit Court of Appeals previously held that the community of Wagner, another city within Charles Mix County, though "biracial in its composition and social structure," was "clearly not a dependent Indian community."  *Weddell v. Meierhenry*, 636 F.2d 211, 213 (8th Cir. 1980).

[¶41.]      Federal protection of the land in Charles Mix County is limited.  Lake Andes, where the Charles Mix County courthouse and jail are located, is a state-chartered municipality.  The city and county both provide substantial services to the area and the community, including law enforcement, fire protection, educational, and maintenance and utility services.  In *Greger*, we recognized that

"[o]ver 600 miles of road in the area are maintained by county and township authorities. Only 22 miles are maintained by the Bureau of Indian Affairs." 1997 S.D. 14, ¶ 29, 559 N.W.2d at 867. Over two-thirds of the Charles Mix County population is non-Indian. *Id.*; *see also* Data USA, *Charles Mix County, SD* (2023), https://datausa.io/profile/geo/charles-mix-county-sd#demographics (reporting a 63.8% White population and a 27.1% American Indian and Alaska Native population) (last accessed Mar. 9, 2026).

[¶42.]        Winckler argues the presence of a Yankton Sioux Tribal Police office in Lake Andes supports a finding of federal superintendence. The Federal Government also provides health and social welfare services to members of the Yankton Sioux Tribe who live within Charles Mix County. However, Winckler erroneously focuses on the issuance of federal aid to the Tribe and its members, not the Lake Andes and Charles Mix County community as a whole. These targeted services are not enough to rise to the level of "active federal control" that the United States Supreme Court has previously required to find federal superintendence. As the Supreme Court has recognized, "health, education, and welfare benefits [provided to the Tribe and its members] are merely forms of general federal aid; . . . they are not indicia of active federal control over the Tribe's land sufficient to support a finding of federal superintendence." *Venetie*, 522 U.S. at 534. As such, Lake Andes does not qualify as a dependent Indian community under 18 U.S.C. § 1151(b).

   *c.*  *Subsection (c)*

[¶43.]  Finally, Winckler argues that Indian title to the previously-allotted lands at issue has not been extinguished. 18 U.S.C. § 1151(c) defines Indian country as "all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same."

[¶44.]  Again, our decision in *Bruguier* controls. We repeated the United States Supreme Court's explanation in that decision:

> The simple criterion is that as to all the lands thus described it was Indian country whenever the Indian title had not been extinguished, and it continued to be Indian country so long as the Indians had title to it, and no longer. As soon as they parted with the title, it ceased to be Indian country, without any further act of Congress, unless by the treaty by which the Indians parted with their title, or by some act of Congress, a different rule was made applicable to the case.

*Bruguier*, 1999 S.D. 122, ¶ 22, 599 N.W.2d at 373 (quoting *Bates v. Clark*, 95 U.S. 204, 208 (1877)). "In sum, Indian title in common, or put another way, tribal title, ended when tribal ownership ended." *Id.* (citing *Yankton Sioux Tribe*, 522 U.S. at 346).

[¶45.]  As discussed above in Subsection (a), we have previously held that the State "has jurisdiction over both ceded unallotted land and *allotted parcels no longer titled in Indian ownership.*" *Id.* ¶ 34, 599 N.W.2d at 376 (emphasis added). Here, the land at issue has passed into non-Indian ownership; thus, its Indian title has been extinguished. Because its Indian title has been extinguished, it does not qualify as Indian country under 18 U.S.C. § 1151(c). Pursuant to 18 U.S.C. § 1151(a)–(c), the State properly exercised jurisdiction over Winckler in both the simple assault case and the failure to appear case.

#31006, #31007

[¶46.] Issues 2 through 5 apply only to Appeal No. 31006, the failure to appear case.

> **2. Whether the circuit court erred in determining the 180-day period within which to hold a trial had not run.**

[¶47.] "[W]e review de novo whether the State violated the 180-day rule in SDCL 23A-44-5.1." *State v. Duncan*, 2017 S.D. 24, ¶ 10, 895 N.W.2d 779, 781. SDCL 23A-44-5.1 provides, in part:

> (1) Every person indicted, informed or complained against for any offense shall be brought to trial within one hundred eighty days, and such time shall be computed as provided in this section.
>
> (2) Such one hundred eighty day period shall commence to run from the date the defendant has first appeared before a judicial officer on an indictment, information or complaint.
> [. . .]
>
> (4) The following periods shall be excluded in computing the time for trial:
> [. . .]
>
> > (b) The period of delay resulting from a continuance granted at the request or with the consent of the defendant or his counsel provided it is approved by the court and a written order filed. [. . .]
> >
> > (d) The period of delay resulting from the absence or unavailability of the defendant; [. . .]
> >
> > (h) Other periods of delay not specifically enumerated herein, but only if the court finds that they are for good cause. [. . .]

SDCL 23A-44-5.1.

[¶48.] "There are two requirements 'for the 180-day period to commence: 1) the defendant appears on a charging document; and 2) before a judicial officer.'"

-23-

*Duncan*, 2017 S.D. 24, ¶ 14, 895 N.W.2d at 782 (quoting *State v. Sorensen*, 1999 S.D. 84, ¶ 14, 597 N.W.2d 682, 684). The 180-day rule "creates a right to disposition of a criminal case within 180 days unless good cause may be shown for delay." *Sorensen*, 1999 S.D. 84, ¶ 12, 597 N.W.2d at 684.

[¶49.] Winckler argues the 180-day period began on January 30, 2024, his alleged initial appearance on the complaint. If so, he claims, the August 19, 2024, trial date was 202 days from his initial appearance and violated the 180-day rule. But the circuit court found that no such initial appearance occurred on January 30, 2024, because Winckler refused to participate. Because no initial appearance occurred on this date due to Winckler's refusal, the clock began running on February 13, 2024, when the circuit court held a preliminary hearing. But at the February 13 hearing, Winckler changed his mind about proceeding pro se and requested court-appointed counsel. "[B]ased on the defendant's request for court-appointed counsel," the circuit court found "good cause for the preliminary hearing to be continued" for an additional two weeks until February 27, 2024.

[¶50.] In the meantime, an indictment was filed, and Winckler's arraignment was set for March 11, 2024. During the time between the February 13 hearing and the March 11 arraignment, Winckler refused to leave his jail cell or communicate with counsel, and Winckler's non-compliance was well-documented in an email thread between the circuit court and Clerk Robertson on March 6, 2024. This refusal to communicate necessitated Goehring's motion to withdraw as counsel and the circuit court's reappointment of new counsel on March 11, 2024. Because of Winckler's refusal to leave his cell and resulting unavailability, his arraignment

-24-

had to be rescheduled for April 8, 2024. The circuit court found that most of the delay "[u]p to this time . . . was caused by [Winckler] refusing to allow the clerk to complete his initial appearance, his delay in getting Court appointed counsel for his preliminary hearing," and his request for substitute counsel in a separate criminal proceeding.

[¶51.]    In *Hays v. Weber*, the defendant refused to communicate with his attorney from December 27 to February 28, a period of 63 days. 2002 S.D. 59, ¶ 18, 645 N.W.2d 591, 598. Due to this refusal, his attorney moved to withdraw as counsel on February 28, and defendant applied for new counsel on March 20. *Id.* In determining when the 180 days commenced, the circuit court excluded the days between the motion to withdraw and defendant's application for new counsel but did not exclude the 63 days prior to the motion to withdraw when defendant refused to speak to counsel. *Id.* On appeal, we excluded the additional 63 days prior to counsel's motion to withdraw, holding, "at a minimum, [defendant] was unavailable for a period of 63 days" and that "[t]he period of unavailability here is directly attributable to [defendant] and the statute requires that it be properly tolled." *Id.*

[¶52.]    Here, Winckler's unavailability was caused by his own refusal to speak with Goehring and leave his cell, necessitating Goehring's motion to withdraw and the reappointment of new counsel on March 11. It was this reappointment of counsel that further delayed his arraignment hearing from March 11 to April 8. Thus, the fifty-four days that elapsed between February 13, 2024, and April 8, 2024, are attributable to Winckler's unavailability due to his delayed request for court-appointed counsel and his subsequent refusal to speak to such counsel, further

delaying the proceedings by requiring counsel's motion to withdraw and the reappointment of new counsel. *Compare id.* (holding an exclusion was appropriate because defendant refused to communicate with counsel and the delay was "directly attributable" to defendant), *with State v. Seaboy*, 2007 S.D. 24, ¶ 12, 729 N.W.2d 370, 373 (refusing to find good cause for an exclusion where "there was no motion to withdraw or any showing that Seaboy's change of counsel caused a delay").

[¶53.] The clock then started again at Winckler's April 8 arraignment, and stopped when he filed his pretrial motion to dismiss on August 13. Excluding the delays that were directly attributable to Winckler's actions and unavailability as discussed *supra*, the calculation of days between April 8, 2024, and August 13, 2024, results in 127 elapsed days. The circuit court did not err when it determined the 180-day period had not run.

### 3. *Whether the circuit court abused its discretion in admitting State's Exhibit 1 over Winckler's objections.*

[¶54.] Winckler next argues the circuit court erred in admitting into evidence State's Exhibit 1, which contained Winckler's bond form paperwork. "[The] standard of review for evidentiary rulings 'requires a two-step process: first, to determine whether the trial court abused its discretion in making an evidentiary ruling; and second, whether [the] error was a prejudicial error[.]'" *State v. Hankins*, 2022 S.D. 67, ¶ 20, 982 N.W.2d 21, 30 (quoting *State v. Thoman*, 2021 S.D. 10, ¶ 41, 955 N.W.2d 759, 772). An abuse of discretion is "a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on full consideration, is arbitrary or unreasonable." *Id.* ¶ 21 (quoting *State v. Babcock*,

2020 S.D. 71, ¶ 21, 952 N.W.2d 750, 757).  Prejudicial error occurs when there is "a reasonable probability that, but for [the error], the result of the proceeding would have been different."  *State v. Carter*, 2023 S.D. 67, ¶ 26, 1 N.W.3d 674, 686 (alteration in original) (quoting *Owens v. Russell*, 2007 S.D. 3, ¶ 9, 726 N.W.2d 610, 615).

[¶55.]          The circuit court admitted Exhibit 1 under the business records hearsay exception.  "Business records qualify for a hearsay exception if they are records of a regularly conducted business activity."  *State v. Dickerson*, 2022 S.D. 23, ¶ 45, 973 N.W.2d 249, 265 (citation omitted).  This exception requires:

> (A)    The record was made at or near the time by—or from information transmitted by—someone with knowledge;
>
> (B)    The record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
>
> (C)    Making the record was a regular practice of that activity;
>
> (D)    All these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with a rule or a statute permitting certification; and
>
> (E)    The opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

SDCL 19-19-803(6).

[¶56.]          Here, the State satisfied the requirements of the business records exception.  The information contained in the bond form paperwork was transmitted by the circuit court to the Sheriff's office, who then produced the form and filed it with the Clerk of Courts.  Robertson, the Charles Mix County Clerk of Court,

testified at trial that it is standard procedure to produce bond paperwork after the circuit court conducts arraignments.

[¶57.] As to subsection (E), Winckler argues that the document is untrustworthy either because his bond conditions changed at one point, or because the bond form is not signed by the circuit court judge. But Winckler cites no authority for the position that these conditions would render the record "untrustworthy," and nothing in the record casts doubt on the trustworthiness of the bond form paperwork. Accordingly, the circuit court did not abuse its discretion in admitting Exhibit 1 under the business records hearsay exception.[8]

[¶58.] Winckler additionally argued in passing at the circuit court hearing, and argues again on appeal, that the probative value of Exhibit 1 was substantially outweighed by dangers of unfair prejudice. "Evidence is relevant if: (a) It has any tendency to make a fact more or less probable than it would be without the evidence; and (b) The fact is of consequence in determining the action." SDCL 19-19-401. "The court may exclude relevant evidence if its probative value is substantially outweighed" by dangers of "unfair prejudice, confusing the issues,

---

8. Although the circuit court admitted Exhibit 1 under the business records exception, it would also be admissible under SDCL 19-19-803(8), the public records exception. *See State v. Richmond*, 2019 S.D. 62, ¶ 28 n.9, 935 N.W.2d 792, 801 n.9 ("Although Richmond does not challenge the admission of his 2015 judgment of conviction, we note that public records, such as a judgment of conviction, are analogous to business records." (citations omitted)); *see, e.g.*, *United States v. Lechuga*, 975 F.2d 397 (7th Cir. 1992) ("When an authorized person certifies facts asserted in public records and reports, such as the fact that defendant was released on bond, or the fact that at arraignment the magistrate judge instructed [defendant] to appear at trial on July 5, those assertions are admissible under the public records exception to the hearsay rules." (citations omitted)).

misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." SDCL 19-19-403.

[¶59.]     Here, Exhibit 1 revealed Winckler was informed of the next court date that he was to appear—the pretrial conference on November 8, 2023—and that he signed and acknowledged the bond form. The circuit court only admitted into evidence the first three pages of Exhibit 1, which contained the bond form and standard bond conditions. Because this evidence is directly related to Winckler's claims that he was not aware of the court date nor obligated to appear, the evidence is of high probative value. Said probative value is not substantially outweighed by any such dangers of unfair prejudice.

[¶60.]     Lastly, in addition to his hearsay and prejudice arguments, Winckler argues that the admission of Exhibit 1 violated his right to confront witnesses because he was not allowed to cross-examine the person who wrote it. In *Crawford v. Washington*, the United States Supreme Court "instructed that the right to confrontation delineated in the Sixth Amendment requires exclusion of out-of-court testimonial statements." *Richmond*, 2019 S.D. 62, ¶ 24, 935 N.W.2d at 799–800 (citing *Crawford v. Washington*, 541 U.S. 36, 68–69 (2004)). The United States Supreme Court "identified certain types of hearsay evidence that are categorically non-testimonial. These include business records[.]" *Id.* ¶ 28, 935 N.W.2d at 800–01.

[¶61.]     We addressed and qualified *Crawford's* categorial exclusion in *State v. McReynolds*, 2020 S.D. 65, 951 N.W.2d 809. In *McReynolds*, the defendant argued the circuit court's judgment of conviction "needed to be admitted through 'some manner of witness' to afford her the opportunity to exercise her constitutional right

to cross-examine a witness about the document." *Id.* ¶ 29, 951 N.W.2d at 817. We held that "[t]he key distinction in determining whether a business record is testimonial and thus subject to the Confrontation Clause is whether the creation of the record was 'calculated for use essentially in the court, not in the business.'" *Id.* ¶ 28 (citation omitted). "Hence, a record 'created specifically to serve as evidence in a criminal proceeding[,]'" such as a laboratory report created specifically for criminal prosecutions, "is testimonial." *Id.* (quoting *Bullcoming v. New Mexico*, 564 U.S. 647, 651 (2011)). We held, however, that a judgment of conviction certified by the clerk of courts "is not a testimonial statement triggering the right to cross-examination as discussed in *Crawford.*" *Id.* ¶ 29; *see also State v. Reinhardt*, 2016 S.D. 11, ¶ 8, 875 N.W.2d 25, 27 (holding fingerprint cards are public records that are non-testimonial in nature because they "are not themselves evidence of any particular crime").

[¶62.] Exhibit 1 is a bond form containing the standard conditions of bond. While possible that a bond form "could be used in a future court proceeding," such as the present case, a bond form is not prepared "specifically to serve as evidence in a criminal proceeding," and is therefore non-testimonial. *Id.* ¶¶ 28, 30, 951 N.W.2d at 817–18. Winckler's inability to confront the person who wrote Exhibit 1 does not violate his right to confront witnesses, and the circuit court did not abuse its discretion by admitting it. Even if the circuit court committed error in admitting Exhibit 1, any such error was not prejudicial in light of the evidence we address in issue 5 below.

> ### 4. Whether the circuit court abused its discretion in admitting Keith Goehring's testimony and Exhibit 5.

[¶63.] Winckler next argues the circuit court violated the attorney-client privilege and confidential communication protections when it admitted State's Exhibit 5 and Keith Goehring's testimony. Exhibit 5, a transcript of Winckler's pretrial conference, contains a statement by Goehring that he wrote a letter to Winckler telling him where to be and when, and that he was unsure where Winckler was that day. Goehring also testified at trial, where he referenced the statement he made at the pretrial conference: "I did send him a letter at the last known mailing address on last Friday advising him to be here today. But again, he's not here."

[¶64.] We review the circuit court's evidentiary rulings for an abuse of discretion. *Hankins*, 2022 S.D. 67, ¶ 20, 982 N.W.2d at 30. South Dakota's attorney-client privilege is set forth in SDCL 19-19-502(b): "A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client: (1) Between himself or his representative and his lawyer or his lawyer's representative[.]" "Four minimum elements exist to invoke [attorney-client] privilege: (1) a client; (2) a confidential communication; (3) the communication was made for the purpose of facilitating the rendition of professional legal services to the client; and (4) the communication was made in one of the five relationships enumerated in SDCL [19-19-502(b)]." *Voorhees Cattle Co., LLP v. Dakota Feeding Co.*, 2015 S.D. 68, ¶ 10, 868 N.W.2d 399, 405 (second alteration in original) (quoting *State v. Rickabaugh*, 361 N.W.2d 623, 624–25 (S.D. 1985)).

[¶65.]         Though elements 1, 3, and 4 are clearly satisfied, the circuit court did

not error in refusing to classify this communication as "confidential." A

communication is confidential "if not intended to be disclosed to third persons other

than those to whom disclosure is made in furtherance of the rendition of

professional legal services to the client or those reasonably necessary for the

transmission of the communication." SDCL 19-19-502(a)(5).

[¶66.]         In overruling Winckler's objections, the circuit court reasoned that

Exhibit 5 contained "the day of the hearing that [Winckler is] charged with missing

that led to the failure to appear charge. I called the case. Asked his lawyer where

his client is. I note that he does not appear." In making this finding, the circuit

court implicitly recognized that Goehring's relay of public information—Winckler's

pretrial hearing date and location—was not a confidential communication. As such,

Winckler did not have attorney-client privilege protections over this communication.

[¶67.]         Winckler further argues that Goehring should not have been allowed

to testify at all, and that any such testimony violated attorney-client privilege. In

denying his objection to Goehring's status as a witness, the circuit court limited

Goehring's testimony and noted:

> There's certain things that [Goehring] can observe and testify to
> as a fact that do not involve a confidential attorney-client
> privilege or any of that kind of information. . . . By saying that
> he was there at the time of the pretrial conference and
> [Winckler] did not appear is, is not anything protected by
> attorney-client privilege. There's no communication going on.
> Just that there's a gentleman there without his client.

[¶68.]         We agree. Any testimony by Goehring related to Winckler's absence on

the date of his pretrial conference did not involve confidential communications

protected by the attorney-client privilege. They were mere observations. Though neither this Court nor the Eighth Circuit Court of Appeals have previously addressed this issue, "other circuits have held that the attorney-client privilege does not apply to communications of the date that a defendant is required to appear in court or to serve a sentence." *United States v. Bey*, 772 F.3d 1099, 1101 (7th Cir. 2014). As we do in the present case, "[t]hese courts reason that a lawyer's communication to a client of the terms of a public court order is simply not confidential advice." *Id.* (citing *United States v. Gray*, 876 F.2d 1411, 1415 (9th Cir. 1989); *United States v. Innella*, 821 F.2d 1566, 1567 (11th Cir. 1987); *United States v. Bourassa*, 411 F.2d 69, 74 (10th Cir. 1969); *United States v. Hall*, 346 F.2d 875, 882 (2d Cir. 1965)). The circuit court did not abuse its discretion in admitting Exhibit 5 and allowing Goehring to testify as a witness.

### 5. *Whether the circuit court erred by denying Winckler's motion for judgment of acquittal.*

[¶69.]     Finally, Winckler argues there was insufficient evidence for a jury to convict him of failure to appear in violation of SDCL 23A-43-31. "The denial of a motion for judgment of acquittal is a question of law we review de novo." *State v. Rogers*, 2025 S.D. 18, ¶ 48, 19 N.W.3d 17, 30 (quoting *State v. Harruff*, 2020 S.D. 4, ¶ 15, 939 N.W.2d 20, 25). "The standard is whether the evidence was sufficient to sustain a conviction." *Id.* (citation modified). "When measuring the sufficiency of the evidence, we ask whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (citation omitted). "We accept the evidence and the most favorable inferences fairly drawn therefrom, which will

support the verdict." *Id.* (citation omitted). "This Court will not resolve conflicts in the evidence, assess the credibility of witnesses, or evaluate the weight of the evidence." *Id.* (citation omitted).

[¶70.] The jury convicted Winckler of violating SDCL 23A-43-31, which provides:

> Any person who, having been released pursuant to this chapter, fails to appear before any court or judicial officer as required . . . shall: (1) If such person was released in connection with a charge of a felony, an alleged felony violation of § 32-23-1, or fails to report for a jail or state correctional facility sentence for any offense, be guilty of a Class 6 felony[.]

Under this statute, the State therefore needed to prove Winckler (1) was released on bond, (2) was required to appear in court, and (3) failed to appear. SDCL 23A-43-31. It is undisputed that Winckler was released on bond, leaving the State to prove Winckler was required to appear in court and that he failed to appear.

[¶71.] Here, the evidence, viewed in the light most favorable to the prosecution, supports the jury's verdict. The State called two witnesses during its case-in-chief, Robertson and Goehring. Through Robertson, the State introduced Exhibit 2, which was the circuit court's standard order setting the time for Winckler's jury trial. The order contained the following statement, which was read into the record:

> It is further ordered that all perfunctory pretrial motions shall be filed and served upon counsel with sufficient notice to be heard at the pretrial conference set for the 8th day of November, 2023, at 1:30 pm. Attendance at the pretrial hearing and conference is mandatory by both counsel and the Defendant, despite the absence of any motions noticed for hearing, unless the case has been resolved or continued prior to that date.

[¶72.]    In addition to Exhibit 2, the State introduced Exhibit 1, the bond form, which contained a similar statement. Robertson further testified that Winckler did not appear at his pretrial conference on November 8, 2023. From Robertson's testimony and Exhibit 2 alone, a rational juror could find that Winckler was aware of the date of his pretrial conference, that his attendance was mandatory, and that he failed to appear at such hearing.

[¶73.]    The State's second witness, Goehring, testified that he reminded Winckler that his pretrial conference date was November 8, 2023. The State admitted Exhibits 4 and 5 through Goehring, which were transcripts of Winckler's arraignment and the pretrial conference. Goehring again read aloud his recorded statement in Exhibit 5 that he reminded Winckler of his hearing date. He further testified to the events of November 8, 2023, and that Winckler failed to appear for the conference.

[¶74.]    After viewing the evidence in a light most favorable to the verdict, a rational trier of fact could have found that Winckler knew he was required to attend his pretrial conference and failed to appear. We conclude the evidence was sufficient to support the conviction of failure to appear.

[¶75.]    We affirm on all issues.

[¶76.]    JENSEN, Chief Justice, and DEVANEY and MYREN, Justices, concur.

[¶77.]    SALTER, Justice, concurs and concurs in result.

SALTER, Justice (concurring and concurring in result).

[¶78.]    I agree that the circuit court possessed subject matter jurisdiction in these two cases for the same essential reason set out by the Court—the situs of

Winckler's offenses is subject to state jurisdiction because it is not Indian country under federal law. However, I believe the disestablishment holding in *Bruguier v. Class*, 1999 S.D. 122, 599 N.W.2d 364, is not correct, and, with great respect, I write separately to briefly explain my views.

[¶79.] A fundamental premise underlying *Bruguier's* disestablishment holding is the idea that a reservation cannot exist without a continuous exterior boundary. *See id.* ¶¶ 15–18, 599 N.W.2d at 370–71. But this is not an accepted Indian law principle. The existence of a continuous exterior boundary can, of course, mark the "limits" of an Indian reservation, 18 U.S.C. § 1151(a), but the converse—the lack of a single continuous exterior boundary means there are no limits to the reservation—is not necessarily true. What matters most is congressional intent and the established rules for how a reservation is created and how it continues to exist:

> Once a block of land is set aside for an Indian Reservation and no matter what happens to the title of individual plots within the area, the entire block retains its reservation status until Congress explicitly indicates otherwise.

*Solem v. Bartlett*, 465 U.S. 463, 470 (1984).

[¶80.] Under these principles, the Yankton Sioux Reservation still exists because part of the land set aside for the Yankton Sioux Tribe in 1858 remains in trust to this day, and Congress has not explicitly indicated an intent to change the land's reservation status. *Compare Yankton Sioux Tribe v. Gaffey*, 188 F.3d 1010, 1021–30 (8th Cir. 1999) (relying on congressional intent to hold that "the Yankton Sioux Reservation has not been disestablished") *with Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584 (1977) (interpreting three congressional acts as evidence of an intent

to diminish the Rosebud Sioux Reservation by changing reservation status for land found in Mellette, Gregory, Tripp, and Lyman Counties). *Bruguier's* statements about congressional intent should be viewed with caution because of an inordinate emphasis on reservation boundaries and an intermingling of the related yet distinct concepts of reservation diminishment and reservation disestablishment. *See Gaffey*, 188 F.3d at 1017 ("Although the terms 'diminished' and 'disestablished' have at times been used interchangeably, disestablishment generally refers to the relatively rare elimination of a reservation while diminishment commonly refers to the reduction in size of a reservation.").

[¶81.] Most, but not all, of the trust land within the original 1858 boundaries of the Yankton Sioux Reservation exists in the form of parcels allotted to individual tribal members in the late nineteenth century. These trust parcels persist today, as if outside of time, exactly as they did generations ago. *See Yankton Sioux Tribe v. Podhradsky*, 606 F.3d 994, 1007–10 (8th Cir. 2010) (holding the same).

[¶82.] But in *Bruguier*, as in this appeal, none of that matters to the correct determination of our jurisdiction, as the Court notes. The land at issue in *Bruguier* and in both of Winckler's cases involves former allotted land that passed from Indian ownership at a time before Congress's enactment of the Indian Reorganization Act of 1934, which effectively froze the disposition of allotted trust land, and before the 1948 enactment of 18 U.S.C. § 1151(a), which "separates the concept of jurisdiction from the concept of ownership." *Podhradsky*, 606 F.3d at 1007; *see also Solem*, 465 U.S. at 468 ("Only in 1948 did Congress uncouple reservation status from Indian ownership . . . .").

[¶83.] Finally, although I can understand the necessity for a state court to determine the extent of its territorial jurisdiction, I am skeptical that the *Bruguier* Court could have authoritatively declared an Indian reservation created under federal law to be disestablished. *See McGirt v. Oklahoma*, 591 U.S. 894, 903 (2020) ("Under our Constitution, States have no authority to reduce federal reservations lying within their borders."). The *Bruguier* decision, in my view, is best read as a correct determination of state court jurisdiction, supportable without regard to its disestablishment holding.